[No. S065707. June 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRANCE CHARLES PAGE, Defendant and Appellant.

## Counsel

Barry Helft, Interim State Public Defender, and Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and William Hassler, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Raquel M. Gonzalez and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEORGE, C. J.**—A jury convicted defendant Terrance Charles Page of the first degree murder of Tahisha Clay (Pen. Code, § 187, subd. (a)) and of the commission of a lewd act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a)).[1] The jury also found true the special circumstance allegation that the murder was committed while defendant was engaged in the commission of a lewd act upon a child. (§ 190.2, former subd. (a)(17)(v).) Following the penalty phase of the trial, the jury returned a verdict of death. Defendant moved for a new trial (§ 1181), to strike the special circumstance finding, and to reduce the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)). The trial court denied the motions and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

sentenced defendant to death. The court also sentenced defendant to a prison term of eight years for the commission of a lewd act upon a child under the age of 14 years. (§ 288, subd. (a).) This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt phase evidence*

#### 1. *The prosecution case*

##### a. *Summary*

Tahisha Clay, six years of age, disappeared on April 23, 1993, when she chased a ball down a hill to an area outside of defendant's apartment. Her body was discovered the next day in a mine pit seven miles away. She had been brutally beaten, suffocated, sexually assaulted, and strangled to death. A swab taken from the outside of her vagina revealed saliva consistent with defendant's genetic profile. Blood discovered on one of defendant's shirts was consistent with Tahisha's genetic profile. A plastic star found embedded in defendant's carpet matched stick-on earrings Tahisha was wearing shortly before she disappeared. Soil on a pair of defendant's pants, on a pair of his boots, and on a mat from one of his vehicles was consistent with the minerals in the mine where Tahisha's body was dumped. There also was evidence establishing that defendant lied when he told the police he had stayed home the evening Tahisha disappeared, and that he had visited a restaurant that evening on the route between his home and the mine where Tahisha's body was found. Defendant exhibited an attitude that evening that evoked suspicion, and he attempted to commit suicide the day after Tahisha's body was discovered.

Because defendant contends the police unreasonably focused upon him to the exclusion of other suspects, and planted evidence to implicate him in the crimes, we describe the evidence as it was developed by the police investigation.

##### b. *Tahisha's disappearance*

Tahisha resided in the Rimrock Apartments in Barstow with her mother, Marianne Clay, her brother Stefan, nine years of age, and her mother's boyfriend, Frank Mond. The apartment complex was surrounded on three sides by a solid block wall five to six feet high, and on the fourth and front

side by an iron fence six feet high. An access code was required to open the gate that secured the entrance to the complex. Tahisha's father, David Clay, served in the United States Army and was stationed at Fort Hunter Liggett, about 80 miles south of Monterey. During David's last visit with Tahisha and Stefan in February 1993, he took the children to a mall in Bakersfield, where he purchased for Tahisha a card of "stick-on" earrings. At the conclusion of the visit, Tahisha returned with the earrings to Barstow.

On the day Tahisha disappeared—Friday, April 23, 1993—her mother picked her up from kindergarten at 4:00 p.m., and they arrived home about five minutes later. On that particular day, Marianne found in her vehicle Tahisha's card of stick-on earrings, and gave them to Tahisha. Marianne explained to Tahisha that on the card particular earrings were assigned to particular days, and that Tahisha should wear a pair of "Friday" earrings because it was Friday. The "Friday" earrings were star shaped. When they arrived home, Tahisha went upstairs to their apartment, taking the card of earrings with her. Her brother Stefan saw her put on star-shaped earrings in their room after she came home from school.

Just prior to 5:00 p.m., Marianne drove Stefan to his piano lesson, and they returned at approximately 5:40 p.m. While Marianne and Stefan were away a neighbor, Ulrike Meyers, watched Tahisha. After they returned from the piano lesson, Tahisha came back to the apartment for about 10 minutes, and then went back outside. Her mother last saw her sometime after 6:00 p.m. when Tahisha was playing with other children at the playground located outside the apartment.

Stefan soon joined Tahisha, and they began tossing a ball back and forth to each other. At some point, the ball rolled down a hill and toward two satellite dishes that were located on the grounds of the apartment complex. Tahisha went to retrieve the ball, and Stefan saw her for the last time when she walked down the hill toward the satellite dishes. As Stefan watched Tahisha head down the hill, he heard their mother call to them to come inside. Stefan then turned around to go back to their apartment. He went upstairs with his mother and told her Tahisha had gone to get the ball.

Approximately 10 minutes later, about 7:00 p.m., Marianne told Stefan to find Tahisha, but he was unable to locate her. Marianne then checked at Meyers's apartment and at the apartments of Tahisha's friends, but Tahisha was not at these locations. Meyers estimated that Marianne came looking for Tahisha after 7:00 p.m., perhaps 7:30 p.m., and that it was starting to get dark. Marianne and other adults then walked around the entire apartment complex, yelling Tahisha's name, but she was not found. By this time, at

approximately 9:00 p.m., Frank Mond, Marianne's boyfriend, returned home. Mond contacted the Barstow Police Department and reported that Tahisha was missing.

In the meantime, as it was getting dark on Friday evening,[2] Michael Elston, another child who lived at the apartment complex, found Tahisha's ball inside a fence surrounding the satellite dishes.

### c. The first week of the police investigation

#### i. The search of the apartment complex

Shortly after 9:00 p.m. on April 23, the first police officers arrived at the large apartment complex and coordinated efforts among officers and private citizens to check all the apartments and areas of the complex. Detective Mark Franey of the Barstow Police Department arrived at the apartment complex at approximately midnight. Franey was informed that efforts had been made to telephone or visit every apartment in the complex, and that someone had been contacted at all but four or five of the units. According to the information received by Franey, one of the apartments at which there had been no response was defendant's apartment. Another belonged to the manager of the apartment complex, who was out of town. The other apartments were vacant.

Defendant's apartment was located directly across from the satellite dishes where Tahisha's ball was found. The apartment had a sliding glass door that faced the satellite dishes. Stefan and his friends sometimes played in the area in front of defendant's apartment, and on occasion defendant emerged from his apartment and yelled at them. Approximately two weeks prior to Tahisha's disappearance, she and her friend, Carrie Pizzo, 11 years of age, were riding their bicycles in front of defendant's apartment when defendant exited through his sliding glass door and told the girls to "get the hell out of there." Eight or nine months earlier, defendant had approached Ashley Cook, one of Tahisha's kindergarten classmates who also resided at the Rimrock Apartments. Ashley was riding her bicycle in circles and singing when defendant attempted to grab her and told her she was being too noisy. Between 1:00 and 1:15 a.m. on Saturday as the search continued, Tahisha's mother told Detective Franey about the incident involving Ashley Cook, and Louis Jannsen, the maintenance man for the apartment complex, told Franey that defendant was "kind of weird." Franey also learned at this time that defendant's apartment was located near the satellite dishes.

Jannsen and Barstow Police Detective Leo Griego then went to the apartment manager's office to obtain information concerning defendant, and

---

[2] On April 23, 1993, sunset—the moment the last ray of sun crests the horizon—occurred at 7:27 p.m. in Barstow, twilight lasted until 7:53 p.m., and then it was dark.

Franey walked to the area of the satellite dishes. By this time, officers had expanded their search outside of the apartment complex and had found a ball similar to Tahisha's ball in a nearby park. Franey traveled to the park, recovered the ball, and returned to the Clay apartment at approximately 1:55 a.m., but Marianne informed Franey that the recovered ball was not Tahisha's ball.

### ii. *First contacts with defendant*

The police first contacted defendant at 2:35 a.m. on Saturday, April 24. Defendant answered the door and invited Detectives Franey and Griego inside. They informed defendant they were conducting an investigation concerning a missing child, and Griego asked him the general questions the police had been asking all the tenants. Defendant stated that he had not seen Tahisha and that he did not recognize her photograph. They soon were interrupted by a third officer who called away Griego.

Detective Franey then assumed charge of the interview. Because Franey believed that defendant had been seen earlier at the apartment complex but had not answered his door, Franey asked defendant about his whereabouts earlier that evening.[3] Defendant responded that he had returned home at approximately 4:00 or 4:30 that afternoon from Fort Irwin, where he worked for DynCorp, supervising the maintenance of firing ranges, and had been in and out all evening. At this point in the interview, Franey was called away. Griego completed the interview and briefly searched defendant's apartment for Tahisha. The officers' initial contact with defendant was approximately seven minutes in duration, from the time they entered his apartment until they departed.

Franey and Griego returned to question defendant on Saturday, April 24, because of a discrepancy in the account he had provided earlier that morning—defendant had informed Franey that he had been in and out of the apartment all evening, but had told Griego that he had been at home from the time he returned from work. Also, Griego had learned that defendant had been seen leaving his apartment at approximately 9:30 Friday evening.[4] Shortly before noon on Saturday, Griego spotted defendant in the apartment

---

[3] Mr. Jannsen had informed Franey that Jannsen had knocked on defendant's door earlier and had received no response, and then later had telephoned defendant and defendant had answered. It is not clear precisely when these events occurred.

[4] Robert Hunskor, whose apartment was next to defendant's unit, testified that he was contacted by Mr. Jannsen sometime between 9:15 p.m. and 9:45 p.m. concerning Tahisha's disappearance. Hunskor then accompanied Jannsen on his search, and they saw defendant leaving his apartment. Jannsen asked defendant whether he cared to help look for Tahisha, but defendant did not join them. The next morning, Hunskor reported to the police that he had seen defendant walking away from defendant's apartment about 9:30 the previous evening.

complex's laundry room. As Griego and Franey followed him back to his apartment, they noticed he was carrying a laundry basket that appeared to contain bedding.

When Franey and Griego described to defendant the discrepancy in the information he had provided, defendant explained that he had been in and out of his apartment, going back and forth to his car and his garage, but had not left the apartment complex all evening. Defendant also stated that someone had telephoned him Friday evening and asked him whether there was a little girl playing in his apartment, and he had told them there was not.[5] The officers asked whether they could search defendant's vehicles and apartment, and he agreed, also giving them access to locked areas of his garage. That was the final contact the police had with defendant on Saturday, April 24.

### iii.  *Tahisha's body is discovered*

On Saturday afternoon, April 24, Ramiro Perez completed his work shift at Fort Irwin, and obtained a ride home with a friend at approximately 3:00 p.m. After they left Fort Irwin, Perez said he needed to relieve himself. The driver stopped her vehicle on Fort Irwin Road, and Perez walked away from the car and over a hill so that he would not be visible to his friend. When he walked over the hill, Perez saw a body later identified as Tahisha's at the bottom of the slope, about 15 feet away. It appeared that she had been thrown over the hill and had rolled to the bottom. Perez reported his discovery to the police.

In response to Perez's report, law enforcement officers fanned out along Fort Irwin Road. After traveling approximately one mile down that road from its intersection with Interstate Highway 15 without locating anything, Deputy Sheriff Robert Durbin of the San Bernardino County Sheriff's Department drove back and decided to check near a mine excavation site that borders the road approximately one-tenth of a mile from the intersection. Durbin parked in a pullout area next to the site and walked into the excavation, which had hills and gullies. At 5:50 p.m., Durbin looked down from an embankment and observed a small body in the pit of the mine. The body was clothed in a dress that was up over the torso, had no underclothing, and had white socks and a single tennis shoe. When Durbin returned to his patrol vehicle, he found the

---

[5] On April 24, Beverly Ann Walker, a resident of the Rimrock Apartments who assisted in the search by telephoning apartments, told Griego that she had reached defendant the night before when she telephoned his apartment. On April 23, she had returned home between 9:00 and 10:00 p.m. and had made telephone calls to residents for an hour or more, until perhaps 11:00 or 11:30 p.m. Walker reported to Griego that in responding to her, defendant had a bad attitude, asked why she was calling his home, and stated that he did not have any children and did not appreciate her calling his home. She testified that defendant's reaction alarmed her, because everyone else was concerned about the search for a missing girl six years of age, but defendant was not concerned.

other tennis shoe on the ground in front of his car. Tahisha's body was not visible from the road; it was necessary to walk over a hill and look down into the pit of the mine to see her.

Detective Franey was familiar with the excavation and the surrounding desert, and testified that the area was used for "four-wheeling," motorcycle riding, and target shooting. On the day Tahisha's body was found, a group of 14 campers was nearby and had driven approximately seven vehicles on the dirt stretch of Fort Irwin Road that borders the excavation. The pullout area on Fort Irwin Road where Durbin parked was used to load trucks with material from the mine, could be used as a turnaround for vehicles, and appeared to Franey to be well traveled, with many tire tracks. While Franey was present at the scene, numerous drivers attempted to drive down the dirt road, but were turned back because of the police investigation. The material on the ground was of a type that would reveal footsteps, but was of a nature that generally would not retain details permitting identification of a shoe print. The only shoe print that could be identified was from Perez's shoe. The police photographed the tire tracks adjacent to the mine and checked the tire treads of all vehicles at the apartment complex that were outside or in garages that had open doors, as well as the tire treads of police vehicles. The police were able to identify tire tracks of the vehicle in which Perez had ridden, and could see where the sheriff's car had driven over that vehicle's tire tracks, but were unable to distinguish any other particular vehicle's tire tracks in the numerous tire tracks that had been made over one another.

In the course of examining tire treads at the apartment complex, the police asked defendant for permission to inspect his vehicles' tires, and defendant agreed. According to Detective Franey, this contact with defendant occurred at approximately 6:30 p.m. on Sunday, April 25.

### iv.  *Defendant's suicide attempt*

At approximately 11:30 p.m. on Sunday, April 25, Police Officer Michael Hayhurst was dispatched to defendant's apartment in response to a report from a suicide hotline that an individual at that apartment had taken an overdose of pills.[6] He found defendant, apparently unconscious, holding a

---

[6] Officer Hayhurst testified that he was assigned to proceed to the apartment in response to the suicide call at "about 11:30 p.m." Dr. Naresh Ganesh, who was the physician on duty at the emergency room that evening, testified that defendant arrived at the emergency room "shortly before midnight" and "around 11:15 p.m." Dr. Ganesh also testified that defendant told him he had taken an overdose of pills "six hours before he came so around 6:00 p.m. . . . . he took them." Because the evidence concerning the time of the last police contact with defendant and the time defendant ingested an overdose of pills is not precise, it is unclear whether defendant's suicide attempt occurred before or after he was contacted concerning the pattern of his tire treads.

large knife in his hand. Hayhurst removed the knife, and defendant appeared to regain consciousness. Hayhurst asked defendant what the problem was, and defendant told him that he had had a lot of stress at work the prior Friday, and that detectives had placed additional stress on him over the weekend regarding the case of a missing girl. Defendant stated that he could not take it anymore and wanted to kill himself. The police arranged for him to be transported by paramedics to Barstow Community Hospital. The knife apparently was left at the apartment.

At the emergency room, defendant repeated that he had suffered stress at work, and stated he was upset because the police detectives considered him a suspect. Blood tests confirmed that defendant had taken an overdose of medication containing acetaminophen in a quantity sufficient to cause fatal liver toxicity. Hayhurst had defendant placed on a 72-hour hold to allow a mental health evaluation. (Welf. & Inst. Code, § 5150.) After spending approximately one day at Barstow Community Hospital, defendant was transferred to the behavioral health ward at Victor Valley Community Hospital, where the police allowed him to check himself in.

v. *Search of defendant's apartment*

On Wednesday, April 28, Franey served a search warrant on defendant's apartment. He was accompanied by criminalist Patricia Lough, who entered the apartment first to vacuum before anyone walked on the floor. She proceeded methodically on her hands and knees, using a vacuum designed for forensic evidence collection. While vacuuming defendant's living room, Lough collected a small plastic star. She had not seen the star before it was sucked into the vacuum. Lough also testified she was not a "hair examiner" and did not recall whether there were any hairs in the filter.

Lough also found in a clothesbasket in defendant's master bedroom a shirt that had two spots of blood. Defendant was wearing the same shirt when Franey first spoke to him in the early morning on Saturday, April 24. Although Franey had not noticed blood on the shirt at that time, he had not looked for blood; the spots were very small, and the lighting was poor. The shirt was similar to the shirt defendant was wearing when Griego observed him in the laundry room on Saturday morning, April 24. On the floor next to the shirt, Lough found a pair of pants that had a white dust-like material on the legs. In the closet of the master bedroom, Lough found a pair of dress boots that also had a white dust-like material on them. In the office area of the apartment, Lough found a knife that had a speck, one millimeter in diameter, of what appeared to be blood on the blade. The specimen was too small to yield information revealing DNA. Finally, Lough removed the floormats from defendant's two vehicles.

Detective Franey found in defendant's apartment a collection of pornographic magazines and videotapes. Fifty-five pornographic magazines were found on the nightstand in defendant's bedroom, including Shaved Pussy, Oriental Delight, and Bridled. Shaved Pussy magazine contains sexually explicit photographs of young women whose pubic hair has been shaved. Oriental Delight magazine also contains sexually explicit photographs of young adult women. All of the models in these two magazines are postpubescent, but some are posed with props such as stuffed toys and a lollipop, and some are wearing kneesocks and saddle shoes and have "pigtails" and bows in their hair. Bridled magazine depicts nude and seminude women who are bound to objects such as chairs and stocks by devices such as ropes and collars. Some have objects strapped into their mouths or tape over their mouths, some are blindfolded, and some have mousetraps or C-clamps attached to their nipples. In many of the photographs, the models exhibit expressions that reflect pain or fear, but none of the photographs portrays strangulation. The three magazines bear inscriptions on their covers that all models are over 18 years of age.

Detective Franey described the 55 magazines found on defendant's nightstand as "hard-core" or "triple-X" pornography. Another 58 magazines, described by Franey as "soft-core" pornography, were found on a bookshelf in the hallway. In addition, 195 X-rated videotapes bearing 550 separate movie titles were stored in a metal cabinet in the apartment. Finally, more than 100 nonpornographic films were found on an open bookshelf adjacent to the metal cabinet. A list of the 113 magazines, identified by title and the location where they were found in the apartment, and including a brief description of each magazine, was admitted into evidence. The actual magazines found in defendant's bedroom were admitted into evidence. A list of the 550 pornographic movies, identified by title, also was admitted into evidence.[7]

vi. *Defendant's whereabouts on April 23*

On April 30, one week after Tahisha disappeared, Detectives Franey and Griego interviewed defendant at Victor Valley Community Hospital. Defendant continued to assert he had stayed home all evening on April 23. When Griego told defendant that Hunskor and Jannsen had seen him leaving at approximately 9:30 that evening, defendant claimed he was confused.

Approximately one week after Tahisha disappeared, the police interviewed Holly Robles, a waitress at Coco's Restaurant, and learned that defendant had not remained at his home the entire evening of April 23. Robles testified that

---

[7] After the trial court ruled that the three magazines selected by the prosecution—Shaved Pussy, Oriental Delight, and Bridled—were admissible, defendant did not object to the admission of additional evidence concerning his pornography collection.

defendant regularly came into the restaurant between 8:00 p.m. and 10:00 p.m. On April 23, he entered the restaurant between 9:00 p.m. and 9:30 p.m., ordered an iced tea, and stayed about 20 minutes. Defendant told Robles that a little girl who had "wandered off Rimrock" was missing. He told Robles that it was the mother's fault, because mothers do not watch their children and leave them with babysitters. He also told Robles that he was on call in the event they found the missing girl and needed a helicopter.[8]

Robles testified that defendant seemed edgy that evening, "[p]laying with napkins and stuff," which she could not recall seeing him do when she had waited on him on other occasions. She testified that he was "scared and jumpy," that his eyes were red, and that she could tell something was wrong. She also had the impression that defendant did not care about the girl who was missing, but she further stated that he "seemed normal" concerning the girl's disappearance.

Coco's Restaurant is located on Main Street in Barstow, several blocks from Interstate Highway 15. Defendant usually went to work by driving on Main Street to Interstate 15, then proceeding on the interstate highway to Fort Irwin Road. The distance from the Rimrock Apartments to the location of Tahisha's body on Fort Irwin Road was approximately seven miles. Detective Franey drove this route several times and arrived at the location where Tahisha's body was found within nine to 11 minutes while keeping within the speed limit.

    d. *Expert testimony*

      i. *Tahisha's injuries*

On Tuesday, April 27, Dr. Frank Sheridan, a forensic pathologist, performed an autopsy on Tahisha. Tahisha was four feet tall and weighed 50 pounds. Dr. Sheridan testified that her body exhibited a grouping of injuries that occurred while she was alive—injuries that were accompanied by bruising, swelling, and redness—and a grouping of injuries that occurred at or after the time of death, when her body no longer reacted to injuries.

Dr. Sheridan began by describing the injuries to Tahisha's head. She had bruises and abrasions on her upper and lower lips, likely caused by someone placing a hand over her mouth to suffocate or silence her. She also had bruises and abrasions on the bridge of her nose, her cheeks, and her chin, which might have been inflicted during a struggle. There also was bruising in

---

[8] Over the course of defendant's visits to Coco's Restaurant, he had told Robles stories he fabricated about working as a medical helicopter pilot. His claim that he was on call apparently was a reference to this fictitious career.

her right temple area. Finally, she had suffered at least two major blows to the back of her head, which caused bleeding in the subdural space between her skull and her brain. Dr. Sheridan testified that the presence of a subdural hemorrhage strongly suggests that the injury was caused when Tahisha's head was in motion and was slammed forcibly into a hard flat surface, such as a floor. Her head might have been slammed into something more than twice, but a blow against the same area of the head as an earlier blow would not cause distinguishable subdural bleeding.

Tahisha also suffered injuries on her arms that had elements of both bruising and abrasions, a combination that typically is seen when someone has been struggling. She had a large bruise as well as abrasions on her left shoulder, and a bruise in the iliac crest region of her back. Dr. Sheridan testified that the blows to Tahisha's head and the injuries to her back and shoulder were consistent with her having been thrown to the floor and held down while she struggled. She also had bruises on her legs and a bruise in her pubic area just above her vagina.

Her body exhibited injuries inflicted by a sexual assault. The vaginal walls were bruised, and the hymen was disrupted. When Dr. Sheridan initially examined the body, blood was flowing from the vagina, indicating there was a laceration as well as bruising. Based upon the location of the bruising, Dr. Sheridan determined that something had been inserted at least one inch inside Tahisha's vagina. Based upon the level of inflammation associated with the vaginal injuries, Dr. Sheridan concluded that Tahisha was alive for longer than one hour, but not longer than three or four hours, after the vaginal injuries were inflicted.

Tahisha's heart and lungs had tiny, scattered, surface hemorrhages that resulted from obstruction of her breathing. Her suffocation, together with the other injuries she suffered while alive, were consistent with someone grabbing her, placing a hand over her mouth, and throwing her down on the floor, followed by a struggle, obstruction of her breathing, and a sexual assault. Tahisha may have lost consciousness due to the blows to her head or the suffocation, but neither of these injuries appeared to be the cause of death. None of the injuries resulted in bleeding, other than the injury to her vagina.

Tahisha died from strangulation. No bruises were visible on the exterior of her neck, indicating that she no longer was struggling at the time of her death, but bruising had occurred deep in the muscles around the larynx and trachea, which is typical of forcible compression of the neck. The evidence of blockage of the flow of blood through her jugular veins included hemorrhaging within the eyes and scalp, congestion in the blood vessels in her brain, and hemorrhaging into the bone around the ear. None of these symptoms

involved bleeding outside the body. Dr. Sheridan testified that strangulation must continue approximately two and one-half to three minutes to cause death.

Tahisha also suffered a cut approximately three centimeters in length on her neck. The wound was inflicted with a sharp instrument, probably a knife. It was an incised wound rather than a stab wound, meaning it ran across her skin. The injury was the type that could occur if someone held a knife to her throat and moved it across her skin. The cut was not deep and was not life threatening. It appeared from the crime scene photographs and from the small amount of blood on Tahisha's clothing that only a small quantity of blood had flowed from this wound, a circumstance indicating the wound was inflicted at or near the time of death.

Finally, there were scrapes on Tahisha's arms, legs, torso, chest, back, and head that did not display any redness or bruising, indicating they occurred at or after the time of death. Because the type of white chalky material found in the mine site was associated with these scrapes, the latter injuries probably occurred when Tahisha's body was thrown down the embankment into the mine pit. The condition of Tahisha's body when found on Saturday, April 24, was consistent with her having been killed sometime on Friday night, April 23. Dr. Sheridan agreed that the actions that caused these various injuries "[c]ould be characterized as a very vicious assault on a six-year-old girl . . . ."

ii.  *Swabs from Tahisha's body*

Criminalist Lough collected evidence from Tahisha's body, including swabs of the inside and outside of her vagina, as well as a rectal swab. Lough began testing the swabs on April 27, before any sample of blood from defendant had been submitted to the crime laboratory. Lough's testing detected the presence of saliva on the outer genital area. Further testing indicated that the person whose saliva was found on Tahisha's body had ABO type A blood. Tahisha had ABO type O blood, which excluded her as the source of the saliva. Defendant is among those persons comprising approximately 30 percent of the population who have ABO type A blood.

Criminalist David Stockwell subsequently performed DNA testing on the external vaginal swab. He found DNA that was consistent with Tahisha's DNA, and also DNA from another person. The three genetic markers that were inconsistent with Tahisha's DNA were consistent with defendant's

DNA.[9] These markers appear on different chromosomes, and thus are independently inherited; that is, whether a person inherits one protein has no relation to whether that person inherits another protein. Stockwell testified that the frequency of individuals having the same genetic markers as found in the DNA that was foreign to Tahisha is approximately one in 400,000.

Criminalist Donald Jones analyzed the internal vaginal swab and the rectal swab using a technique known as restriction fragment length polymorphism, or RFLP. The RFLP procedure employs an enzyme that recognizes certain sequences of DNA and severs or "restricts" the DNA in certain locations. The length of particular sequences of DNA will vary among individuals. Therefore, the RFLP test may establish that DNA from more than one individual is present by revealing different lengths of the selected sequences of DNA, and may establish whether the foreign DNA is consistent or inconsistent with a particular foreign donor.

Because the internal swabs were collected from parts of the body that slough off epithelial cells, these swabs contained large amounts of Tahisha's DNA. Lough had suggested to Jones that these swabs also might contain foreign DNA from saliva. Therefore, Jones had the task of attempting to identify any foreign epithelial cells shed from the mouth in saliva, amidst a much larger quantity of epithelial cells from the victim. In attempting to maximize the amount of any foreign DNA in the tested sample, Jones used 10 to 12 times the amount of sample that normally is tested.

Jones's RFLP test generated results that reflected the presence of Tahisha's DNA, as well as some sequences of DNA that were different lengths from the sequences of Tahisha's DNA. Jones testified that "overloading" of the sample may have resulted in a higher incidence of "partially digested" DNA—sequences that were not severed at the proper site on the DNA and therefore were a different length. In Jones's opinion, the sequences of DNA that were a different length from Tahisha's DNA were "partial digests" rather than foreign DNA. Although Jones concluded that the sequences that were of a different length from Tahisha's DNA were due to partial digests, he also testified that such sequences could result from foreign DNA or from bacterial DNA present in the body; if they were the result of foreign DNA, they were not the product of defendant's DNA.

---

[9] Stockwell tested the DNA for seven markers, and found three markers that were inconsistent with Tahisha's DNA. The DQA1 marker matched defendant's marker. The GYPA marker results reflected a type A, which was Tahisha's type, and a type B, which was foreign to Tahisha. The presence of both A and B types reflected that the foreign donor was type B or type AB, because any "A" from a type AB foreign donor would be indistinguishable from Tahisha's type A. Defendant is a GYPA type B. The D1S80 marker matched defendant's marker.

### iii. *Blood on defendant's shirt*

Criminalist Lough performed a test on a spot of blood one millimeter in diameter located on the neck of a shirt found in defendant's apartment, to determine whether five different genetic markers were present. Lough was able to extract only one genetic marker—identified as a PGM1 subtype—because the sample was very small. That subtype appears in approximately 40 percent of the population. The genetic marker matched Tahisha's blood, but did not match defendant's blood.

Criminalist Stockwell tested a second spot of blood, which appeared on the upper left front of the shirt and measured several millimeters in diameter. Stockwell analyzed two genetic markers identified as GM/KM (or gamma marker and kappa marker). These two markers are independently inherited, and they provide useful statistics by which to distinguish among various population groups. Among the three racial groups that comprise the majority of San Bernardino County—Caucasians, African-Americans, and Hispanics—the type of GM protein in the bloodstain never appears among Caucasians or Hispanics, but appears in approximately three of every 1,000 individuals of African-American ancestry, including those having mixed-race ancestry. Because the GM protein in the bloodstain excluded Caucasians and Hispanics as possible sources, Stockwell considered the frequency of the bloodstain's type of KM protein among the African-American population. This type of KM protein found in the bloodstain occurs in 44.9 percent of individuals with African-American ancestry, including those having mixed-race ancestry. These results excluded defendant, who is Caucasian, as a source of the bloodstain. These two factors matched Tahisha, whose father is African-American and whose mother is Caucasian.

Although the type of testing performed in 1993 required use of the entire bloodstain, after that testing there remained cellular material that had adhered to the fabric. This material was saved in anticipation of advances in testing technology. In 1996, Stockwell was able to test seven locations on the DNA for genetic markers that are independently inherited.[10] Each of the seven markers matched Tahisha's blood. Stockwell calculated that the frequency with which someone with this genetic profile would appear in that population is one in 400 million.

---

[10] These sites were identified as DQA1, LDLR, GYPA, HBGG, D7S8, GC, and D1S80. The protein on these sites is found in the population with African-American ancestry, including mixed-race ancestry, with the following frequencies: (1) DQA1—3.3 percent, (2) LDLR—34.8 percent, (3) GYPA—23.2 percent, (4) HBGG—20 percent, (5) D7S8—37.9 percent, (6) GC—14.6 percent, and (7) D1S80—about 6 percent of that population.

### iv. *Stains on defendant's shirt*

There was a pink stain on the left sleeve of defendant's shirt, which appeared to be similar in color to pink stains on the front of Tahisha's dress. Criminalist Lough was unable to determine what caused the pink stain on the shirt or whether that stain was caused by the same substance as the stains on Tahisha's dress. Lough could not find any expert who could compare the stains on the two articles of clothing, but a Federal Bureau of Investigation (FBI) laboratory agreed to compare the stain on defendant's shirt to other substances provided by Lough in an attempt to find a match. The FBI laboratory was provided four of Tahisha's lipsticks, but they did not match the pink stain on defendant's shirt.

### v. *The plastic star*

On April 28, the day Lough vacuumed a plastic star from the carpet, Franey was unaware Tahisha had been wearing stick-on star earrings on the day she disappeared. The investigation into possible sources of the pink stains on defendant's shirt and Tahisha's dress led Franey, on May 3, 1993, to question Tahisha's family about anything she may have been wearing as makeup. He asked Stefan what Tahisha "had on" the day she disappeared, but apparently did not specify that he was referring to makeup. In response, Stefan retrieved a card that held stick-on earrings, and told Franey that Tahisha had been wearing the star earrings labeled as "Friday" earrings. Franey observed that the star impression on the card was approximately the same size as the plastic star that Lough had vacuumed and collected from defendant's carpet. Franey confirmed with Tahisha's mother and with the neighbor, Ulrike Meyers, that Tahisha had been wearing the star earrings that day.

Franey could not find any store in Barstow that sold stick-on earrings identical to those on Tahisha's card of earrings. Franey learned from Tahisha's father that Tahisha's card of earrings was purchased at the Kids Mart store in Bakersfield. Franey determined that there was no Kids Mart store in Barstow. Franey purchased from the Bakersfield Kids Mart store several packages of the stick-on earrings for comparison and testing. Franey also purchased the brand of stick-on earrings that were available in Barstow.

Criminalist Craig Ogino tested a stick-on earring from a package purchased at the Kids Mart store in Bakersfield to evaluate whether the earring found in defendant's apartment might have been tracked into his abode on the bottom of a shoe. Ogino stuck the earring to the sole of a shoe and took five steps on a sidewalk like that outside defendant's apartment. Examined under a microscope, the stick-on earring had pitting and scratch marks. In contrast, the

stick-on earring found in defendant's apartment did not have the same type of damage. Ogino concluded that no one had walked on the stick-on earring found in defendant's apartment.

Criminalist William Matty, who specialized in analyzing "tool marks"—manufactured items that have been marked in some manner by another object—examined the stick-on star earring found in defendant's apartment, the card of stick-on earrings produced by Stefan, and the cards of stick-on earrings purchased by Franey in Bakersfield and Barstow. The markings were not adequate to establish that the stick-on earring found in defendant's apartment came from the earring card obtained from Stefan, but Matty determined that the stick-on earring was from the type of card produced by Stefan and obtained by Franey in Bakersfield, but not from the type purchased by Franey in Barstow. Matty also concluded that the stick-on earring was identical in appearance to "Friday" stick-on earrings on the cards purchased in Bakersfield, and that this earring matched the outline of a star that was faintly visible in the location where a "Friday" earring would have been located on the card obtained from Stefan.

### vi. *Bentonite*

Erich Paul Junger, an expert on forensic trace examination and forensic geology, studied the pants and boots retrieved from defendant's apartment, the floormats obtained from his vehicles, and a sample of the geologic substance taken from the mine location where Tahisha's body was found. The material from the mine was bentonite, a fluffy clay containing bits of other minerals. Junger found bentonite in the toes, the side seam, and some webbing in the boots. There also were white smears of bentonite on the pants, and particles of bentonite inside the pants cuffs. Finally, traces of bentonite were found on a car mat from one of the vehicles. The bentonite found on defendant's belongings was of the same color and type as the bentonite taken from the crime scene. The bentonite had the same general ratio of other minerals mixed in, and was relatively pure compared to bentonite that may be found at other sites, such as quarries that have been abandoned and exposed to the elements. The boots and pants did not have any sand or other types of stray soil that might be picked up if the wearer had walked around other places in addition to walking in a bentonite deposit. Junger testified that because only bentonite was found on the items of apparel, the material could be analyzed and characterized despite the small sample obtained from the items. Junger concluded that the bentonite on defendant's belongings could have come from the excavation where Tahisha's body was found.

Junger also examined 27 soil samples collected by Detective Franey in the Barstow area. Franey consulted with persons who worked at Fort Irwin, in

order to determine the various locations to which someone who worked in range control might walk, and collected 19 of the samples at Fort Irwin. Franey also collected three samples at the Rimrock Apartments, and five samples at various locations in the desert, including in and around the mine where Tahisha's body was found. Two samples taken from sites within the quarry contained bentonite, but the samples taken from Fort Irwin, defendant's apartment complex, and other locations did not contain bentonite. There are six bentonite mine sites within a 50-mile radius of the crime scene, but only the site where Tahisha's body was found had white bentonite.

### vii. *Pubic hair found on Tahisha's dress*

Tahisha's dress was not removed until the autopsy was performed. The dress then was delivered to criminalist Lough for examination. Upon removing the dress from its sealed bag on April 30, Lough found a pubic hair on the dress. Lough had examined the dress at the mine pit, but she had not seen the pubic hair at that time. The pubic hair did not match defendant's, defendant's girlfriend's, Tahisha's mother's, or her mother's boyfriend's hair. Five other hairs found on Tahisha's dress matched Tahisha's hair. Forensic expert Junger testified that the pubic hair had a razor-cut edge such as one might find on a hair that had been shaved in the manner depicted in Shaved Pussy magazine. He also testified that hair is resilient and may be transferred easily from one location to another.

### 2. *The defense case*

#### a. *Evidence concerning defendant's background, character, conduct, and habits*

Defendant did not testify at trial, but evidence concerning his life and character was presented by psychologist Edward Fischer, who examined defendant, and by defendant's family and friends. Defendant was born in 1951. He had two brothers—Kenneth, born in 1949, and Kevin, born in 1963—and two sisters—Deborah, born in 1954, and Brenda, born in 1957. The five siblings were raised by defendant's mother and stepfather, who struck his wife and children with his hands, spanked defendant, and hit defendant with a belt. As a child, defendant was timid, shy, and passive, and had no close friends. He was taunted and called retarded by his siblings and other children. He received poor grades in school, and was in special education classes from the seventh grade until he left high school during his junior year and enlisted in the Army at 17 years of age. As an adult, he remained passive and avoided confrontation.

Defendant served in Thailand, Vietnam, and Korea. While in the Army, he worked as a wheeled vehicle mechanic, and became sergeant first class in

charge of a small motor pool. Defendant met his future wife, Kwang Lee Chong, in Korea. Their first child was born in 1976; they wed in 1978; the family moved to the United States in 1979, and their second child was born in 1980. In 1981, the Army transferred defendant to Allentown, Pennsylvania. In Allentown, Kwang purchased a convenience store, and when the Army transferred defendant to Hawaii in 1984, Kwang remained in Allentown with their children to operate the store. In 1987, the Army transferred defendant to Fort Irwin. Defendant and Kwang remained friends, and their children visited defendant once after he was transferred to Fort Irwin, but Kwang and defendant did not reside together after 1984, and they divorced several years prior to his arrest. They remarried after his arrest. Kwang testified that defendant was a wonderful father and a good husband.

Defendant became depressed after his marriage failed, and began drinking alcoholic beverages more than he had in the past. While serving in the military at Fort Irwin, defendant began drinking during the day, and some-times would leave work after lunch and go out into the desert and become intoxicated. Defendant received a "bad efficiency report" after an officer discovered his alcohol-related activities, and defendant then was given the option of retiring from the military. He chose to do so in July 1988, after 20 years of military service, rather than face further military discipline.

When defendant retired from the military, he became a firing range maintenance supervisor at Fort Irwin for DynCorp, a military contractor. His supervisor at DynCorp, Larry Blaine, testified that defendant was a hard worker and an exacting supervisor to the 15 employees who worked under him, and performed his job extremely well. In 1992, when DynCorp was awarded a five-year contract to continue managing Fort Irwin, the new contract's listing of job titles that were funded pursuant to the contract did not include defendant's job title. Thereafter, despite Blaine's reassurances, defendant had a fear, bordering on the abnormal, of losing his job. Blaine also testified that defendant was generally quiet and withdrawn at work. Blaine did not believe that defendant attempted suicide because of job concerns, and also did not believe he could have committed the crimes with which he was charged. When defendant's apartment was cleared out after his arrest, Blaine was shocked to learn that defendant had been taking property from DynCorp and the Army.[11]

---

[11] Defendant's criminal history was minimal. As a teenager, he entered a neighbor's trailer without permission, entered a neighbor's shop without permission, and was seen looking into the windows of a residence. In 1987, defendant was investigated for shoplifting a cassette tape at the Fort Irwin Exchange, was punished with the loss of two months' pay, and received a letter of reprimand. When defendant's apartment and garage were searched, it was discovered he had taken about $1,700 of property from DynCorp and the federal government.

Vicki Evans, whom defendant supervised at DynCorp, testified that defendant was very concerned about job security and spoke of that frequently. In 1991, when Evans underwent chemotherapy and could not work, defendant visited her once or twice a week to ask whether she needed anything. During those visits, he always was a gentleman to her daughter, who then was 12 or 13 years of age. Evans testified that defendant was very passive, and in her view would not commit the charged crimes.

Manuila Cahill testified that she and her daughter, Monique, commuted with defendant to and from Fort Irwin, where she worked and Monique attended school. Sometimes she and Monique watched movies at defendant's apartment, and he always was very nice and a very good friend. Cahill was surprised that defendant was interested in the sort of pornography admitted into evidence, that he might attempt suicide, and that he would steal from his employer. Monique testified that she met defendant when she was 11 or 12 years of age, and that he was a sweet, caring, sensitive, calm, polite, and respectful person who never would scream at a child or grab a child who was riding a bicycle.

Deborah Wartenbe, the manager of the Rimrock Apartments, testified that defendant complained about loud children riding their bikes, climbing on the fence by the satellite dishes, and playing around his apartment, which was in a building of the complex that housed only adults. She also testified that he usually washed his laundry on Saturday morning.

Defendant's former girlfriend, Sylvia Twiford, met defendant in 1987, and resided with him for one and one-half years in 1991 and 1992. Sylvia testified that on Saturday mornings, defendant would wash his laundry, vacuum, dust, and do any other cleaning. She also testified that when children played around the satellite dish by his apartment, he would shoo them away, sometimes yelling at them. She saw him lose his temper and scream and yell at a man who angered him, but she described him as a hard-working, kind, considerate, introverted, shy, and overall nice person who would not commit the charged crimes.

DuWayne Vandruff worked with defendant and became friends with him at Fort Irwin when both men were in the Army and they began to work for DynCorp. Vandruff described defendant as an "all-around nice guy." Vandruff resided at defendant's apartment for two or three months, and remembered children being near the satellite dish outside defendant's apartment, but never saw defendant yell at the children. Vandruff did not believe defendant was capable of committing the charged crimes.

b. *Evidence concerning defendant's activities on April 23 and 24, 1993*

Larry Blaine testified that on April 23, defendant did not express any concern about his job, and that defendant's demeanor was normal when he left work. The only concern defendant expressed to Blaine on April 23 was that defendant needed to leave at approximately 4:30 p.m. so he would not be late picking up his carpool riders. Manuila Cahill testified she was commuting with defendant in April 1993 and usually arrived home at approximately 5:30 p.m.

Robert Hunskor, whose apartment was next to defendant's, testified that he was contacted by Mr. Jannsen sometime between 9:15 and 9:45 p.m. concerning Tahisha's disappearance. The two men then walked by defendant's apartment as defendant exited from his front door. When the threesome reached the area where cars were parked, defendant and the other two men parted ways. Hunskor did not recall that defendant had anything in his hands as he left his apartment. From Hunskor's apartment, Hunskor could not see the area between defendant's door and defendant's vehicles, and did not know whether defendant had made additional trips between his apartment and his vehicles. Defendant seemed "normal" to Hunskor when Jannsen and Hunskor encountered him that evening. Hunskor's and defendant's apartments shared an internal wall, but Hunskor did not hear any noises from defendant's apartment on April 23 or at any other time.

Holly Robles was working her shift as a waitress at Coco's Restaurant in Barstow on the evening of April 23, 1993. Robles testified that on that evening, defendant arrived at the restaurant between 9:00 and 9:30 p.m. and departed about 20 minutes later.

When Beverly Walker, a resident of the Rimrock Apartments, returned home on April 23, it was dark and there were at least three police cars at the apartment complex. She agreed to assist in the search for Tahisha and received a list of telephone numbers to call, which she began calling between 9:30 and 10:00 p.m. Walker made telephone calls to residents for an hour or more, until perhaps 11:00 or 11:30 p.m. At some point during this time period, Walker contacted defendant by telephone at his apartment.

At 1:15 a.m. on April 24, Detective Griego observed defendant's vehicle in a parking area of the apartment complex. At 2:35 a.m., Franey and Griego went to defendant's apartment. Defendant appeared to have been sleeping, and was calm when the officers spoke to him. Shortly before noon on Saturday, defendant was in the apartment complex's laundry room, apparently just finishing washing some laundry.

c. *DNA evidence*

Marc Taylor, a forensic scientist, evaluated the DNA testing performed by the prosecution's experts. With respect to the outer vaginal swab, Taylor testified that Stockwell properly performed the DNA testing on this sample, that Stockwell's results were accurate, and that these results were what one would expect to find if defendant had left his saliva on Tahisha. Taylor also stated that the figure of one in 400,000 was "a close estimate." With respect to Jones's testing of the internal vaginal and rectal swabs, Taylor criticized Jones's decision to "overload" the sample. Taylor also testified that the results of Jones's RFLP test reflected either "partial digestion" of Tahisha's DNA or foreign DNA, and that if the DNA was foreign, it did not match that of defendant. Taylor agreed that the test results did not establish the presence of foreign DNA.

Taylor did not find any flaws in Stockwell's testing of the blood found on defendant's shirt, and agreed that all of the markers in that blood matched those of Tahisha. In calculating the frequency with which an individual with these markers would appear in the population, Taylor expressed discomfort with a formula using the GM and KM statistics in combination with the other DNA markers. Instead, multiplying together the frequency of the markers, without consideration of the GM and KM statistics, Taylor calculated that all of these remaining markers would appear in one in every 552,000 persons.

d. *Bentonite*

Dr. Joan Esther Fryxell, a geology expert, testified that the sample of bentonite collected from defendant's belongings was too small to permit identification of its source. Fryxell also testified that the color of bentonite is not a reliable characteristic with which to determine its source, because if the minerals in the clay are light colored, the addition of a small amount of impurities may change the color drastically, while dark minerals will be affected only minimally by the addition of impurities. Accordingly, the chemical composition of two samples may be nearly identical, but their colors may be different.

Fryxell agreed that the bentonite found on defendant's belongings was similar to the bentonite from the crime scene, but stated that the primary characteristics of the bentonite found on defendant's belongings also were similar to those of the bentonite found in other locales. She testified that most of the terrain in the Fort Irwin area that is used for firing ranges is weathered and would not have soil that would match the bentonite from the crime scene. She agreed it was unlikely the bentonite on the dress boots found in defendant's apartment could have come from walking in the flat areas of Fort

Irwin. She also testified that a bentonite fragment found on the work boots defendant kept at work and wore while supervising the maintenance of the firing ranges did not match the bentonite found on his dress boots or the bentonite from the crime scene. She confirmed she had been told by the defense that defendant did not have any explanation regarding the source of the bentonite on his dress boots.

William Mann, the owner of the company that operated the excavation site where Tahisha's body was found, testified that his company's active operation of the excavation site was sporadic; about twice a year, a bulldozer was sent to the excavation to gather a large stockpile of bentonite, and every month or two, when trucks arrived to haul away bentonite, a "loader" was sent to the site. According to Mann, in April 1993 one other actively mined bentonite site was located in the Fort Irwin area.

### e. *The plastic star*

Defendant presented evidence suggesting that the star found in his apartment might have come from some other child, might have been brought into the apartment by adhering to something other than the sole of a shoe, or might have been placed in the carpet after defendant had vacuumed on Saturday. Defendant's forensic expert, Marc Taylor, agreed that the star could have come from Tahisha's card of earrings, but testified it also could have come from any card of earrings that were produced using the same mold, which had several small defects. Taylor speculated that the adhesive on the back of the star was capable of clinging to the side of a shoe or trousers, but he did not analyze the stick-on star earring.

Both Mabel Pizzo, the mother of Tahisha's friend Carrie Pizzo, and Carrie testified they never had seen Tahisha wear earrings and they were certain that other children residing in the apartment complex wore stick-on earrings.

The carpet in defendant's living room apparently had been vacuumed before Lough vacuumed the carpet for evidence. A photograph of the living room taken at the time the search warrant was served revealed marks from what Franey described as a "standard vacuum cleaner," which were different from the marks left by Lough when she vacuumed.

### f. *Pubic hair found on Tahisha's dress*

Marc Taylor testified that hair may be very important evidence, particularly in cases involving sexual assault. He agreed that because pubic hair generally is confined in clothing, such hair usually is not found floating in the air. He testified that finding a pubic hair on a victim in a mine pit is more significant

than finding a pubic hair on a victim in a motel room or bathroom. Taylor also testified that he would expect to find hairs in an apartment from a victim who was assaulted, thrown on the floor, and left on the floor for a few hours.

### g. Medical and psychological evidence concerning defendant

Defendant's two psychological experts testified during 11 days of the trial. Dr. Edward Fischer testified concerning defendant's background, the results of various tests administered to defendant, the nature of defendant's pornography collection, and the various types of child molesters. Dr. Veronica Thomas, a clinical and forensic psychologist, testified concerning pornography, sexual behavior, and pedophilia.

Fischer testified that defendant had fibril convulsions as an infant, but outgrew his seizure disorder. Fischer also testified that defendant had a history of migraine headaches, beginning at 24 years of age, after he had been knocked unconscious in Vietnam.[12] Defendant denied all drug use but admitted consuming alcoholic beverages when he was depressed. Defendant told Fischer that he was exclusively heterosexual, and until he met Kwang, all of his sexual activity was with prostitutes. Defendant also told Fischer that all of his sexual relationships had been with adult women.

Fischer administered several tests to defendant to evaluate his brain function. The Bender-Gestalt visual motor test led Fischer to believe that defendant was compensating for some "marginal sort of brain damage." Fischer also administered to defendant the Wechsler Adult Intelligence Scale—Revised, on which a person of average intelligence will have a score of 100. Defendant's verbal score was 84, his performance score was 93, and his full-scale score was 87, which is in the "dull normal" range. Fischer also administered the Wide Range Achievement Test, which reflected that defendant had improved his reading and writing abilities over his lifetime beyond the level that would be expected from one with his native intelligence, but that he had difficulty performing simple computational problems. The Luria-Nebraska Neuropsychological Battery generated similar results.

Fischer testified concerning medical tests administered by others. An electroencephalogram (EEG) and a magnetic resonance imaging (MRI) test

---

[12] Defendant reported to Fischer defendant's having been rendered unconscious on at least two occasions as an adult. Fischer acknowledged that defendant had told Dr. Richard Hall, a Department of Corrections psychologist who had evaluated defendant, that defendant had not been rendered unconscious, and that the medical records reviewed by Fischer did not reflect that defendant had been rendered unconscious. Fischer concluded that defendant was "not a reliable historian from my perspective." Fischer also expressed uncertainty concerning whether defendant was dishonest or delusional.

were performed upon defendant in March 1997. Fischer testified that the results of the EEG were normal. He also testified that the MRI test reflected that defendant had many small lesions within the deep white matter of both cerebral hemispheres, which was consistent with his learning disability and other indications of brain dysfunction that Fischer perceived in defendant. Fischer testified that defendant has an arachnoid cyst in his left temporal lobe, which may be the cause of his "rather unusual affect."

Various tests were administered by Fischer and others to evaluate defendant's personality and psychological tendencies. Fischer testified that Dr. Fredman at Victor Valley Community Hospital administered to defendant the Minnesota Multiphasic Personality Inventory (MMPI) about three days after Tahisha's death. The answers given by defendant when Fredman administered the test indicated that defendant suffered from depression, which is associated with sadness, pessimism, brooding, being "self-punitive," and feeling a lack of self-worth. Defendant's answers also reflected "mania," which Fischer described as "the opposite of depression." Fischer stated that this "paradoxical sort of profile" is "found in people who have brain damage . . . . And the impact of the mania seems to make them a bit more agitated and unable to sit still about it. In some aspects it energizes the depression and may make it easier for them to act out." Fischer testified that defendant's profile was different from the profile of a person who would commit a vicious, senseless crime. Fischer also testified that the "pedophilia score" on the MMPI administered by Fredman indicated that it was "unlikely that [defendant] has any interest in children as sex objects."

Fischer administered to defendant the Rorschach "inkblot" test in December 1996. Fischer testified that defendant's failure to perceive human movement in any of the shapes was consistent with a person with brain dysfunction who does not imagine or fantasize. Fischer also testified that defendant's responses reflected vulnerability and depression, and lacked "any indication of a failure of impulse control or any tendency toward expressing aggression or explosiveness." A Thematic Apperception Test also reflected that defendant lacked imagination.

Fischer diagnosed defendant as suffering from major depression, dementia, and a learning disorder. Fischer identified, among physical conditions that affected defendant's mental state, defendant's high blood pressure, migraine headaches, the temporal lobe cyst, and the multiple brain lesions. Finally, Fischer identified as "personality disorders" defendant's desire to be cared for by others, such as by his wife, and his "obsessive compulsivity, the need for orderliness of things and need to be in control." According to Fischer, there was no indication in defendant's history or psychological tests that he was a pedophile or a violent person.

Fischer testified that defendant told him there was no history of child molestation in defendant's family, and Fischer confirmed that this information was important to his evaluation of defendant. The prosecutor asked Fischer, hypothetically, whether Fischer's evaluation would be affected if Fischer learned that defendant's older brother, Kenneth, had molested Kenneth and defendant's two sisters, Kenneth's daughter, and Kenneth's stepdaughter, and that Kenneth had committed suicide when the molestation of his stepdaughter was discovered. Fischer responded that "it would increase the probability that [defendant] was somehow sexually deviant." Fischer added, however, that defendant's "history [is] remarkably different. And it would also appear that his brother had a much different personality."

The trial court ruled that police records concerning Kenneth's sexual molestation of Kenneth's daughter and stepdaughter were admissible for purposes of impeachment. The prosecutor provided the police records to Fischer, and Fischer testified that the records revealed that Kenneth had used pornographic videos in the course of introducing his daughter, then four years of age, to sex, and that Kenneth engaged in various sexual acts with her. The records also revealed that when Kenneth was confronted concerning his molestation of his stepdaughter, he committed suicide. Fischer also testified that the defense investigator, Mr. Ron Hawkins, had informed Fischer during a break in the proceedings that Kenneth had molested Kenneth and defendant's two sisters. Fischer stated that none of this information caused him to doubt the validity of his opinions concerning defendant.

The next day, Fischer confirmed he had learned that morning that defendant had informed Dr. Thomas, defendant's other psychological expert, that defendant had been molested by his brother Kenneth when defendant was six or seven years of age. Fischer rejected the suggestion that this information established it was "very likely" that defendant was a child molester, and stated that the information did not alter his conclusions regarding defendant.

When questioned by the prosecutor concerning an MMPI that Fischer administered to defendant in November 1996, Fischer testified that defendant's score on the "pedophilia scale" was 66, which indicated that defendant had more pedophilic tendencies than 93 percent of the population, and his score on the "sadomasochistic scale" was 85, which indicated that defendant had more sadomasochistic tendencies than 98 percent of the population. Fischer testified that the test results did not appear to be valid, because "so many scales are so incredibly elevated," and that Fischer had disregarded the results and had not included them in his report. Fischer attributed the test results to "an incredible amount of exaggeration" by defendant, which may be accomplished by giving the least socially desirable answer to each true/false question. Fischer confirmed that he could not determine whether a

test taker was lying or answering truthfully, and he agreed that if defendant's answers were truthful, the test results would indicate that defendant very likely was a child molester and that defendant had sadomasochistic tendencies in interpersonal relations. Fischer further agreed that if the test results were valid and reflected defendant's true personality, defendant was "the type of person that would do what was done to Tahisha Clay." Fischer added that the test results were inconsistent with the apparent absence of violent crimes in defendant's history.

When asked how a person with defendant's psychological profile would react in the aftermath of bringing a child into his apartment, molesting her, and rendering her unconscious, Fischer responded that such a person would have fled and attempted to avoid the situation. Fischer testified that he did not believe that such a person would have been able to go to Coco's Restaurant and talk to the police if he had committed these acts, and that such a person would not have been able to reflect upon the situation and decide that killing the child was the best option. Fischer expressed the view that if defendant had committed these crimes, he would have become very depressed, would have confessed if confronted with the crimes, and then might have attempted to commit suicide. Fischer testified that defendant's suicide attempt "might have resulted from his being the perpetrator but . . . also might have resulted from his being worried about his job and being the subject of the investigation."[13] Fischer also testified that defendant was timid, and agreed that if defendant were capable of attacking another person, he would attack a child rather than an adult.

Fischer also addressed the issue of defendant's collection of pornographic materials. To provide some perspective regarding the collection, Fischer prepared a videotape comprised of random 30-second excerpts (from defendant's pornographic video collection), which was shown to the jury. Fischer testified that none of the 30-second random excerpts and none of defendant's magazines that the prosecutor had chosen to bring to court included children or portrayed anything illegal, and that he considered defendant's pornography to be within the normal range of such materials.

With respect to Bridled magazine, which portrayed women who were bound, Fischer stated that defendant may have purchased the magazine out of curiosity, and that it was a normal publication when considered in the context

---

[13] Fischer learned that defendant had attempted suicide on other occasions prior to the April 25 attempt, but defendant had concealed those attempts. Fischer testified that when defendant attempted to commit suicide on April 25, he was worried about losing his job at DynCorp. It appeared to Fischer that defendant's being roused out of bed in the middle of the night by police officers who were looking for Tahisha was one of the factors that drove him to attempt suicide.

of defendant's entire pornography collection. In Fischer's opinion, Shaved Pussy and Oriental Delight magazines catered to persons who were interested in or fantasized about adolescent girls, and Fischer viewed such magazines as "a component of normal sexuality." With respect to "little girl" costumes, Fischer testified that pedophiles "are more fixated on the age of the child than they are on the way the child is dressed." Fischer noted that some of the magazines found in defendant's bedroom were old.[14] According to Fischer, the "Coolidge Principle," which suggests that something "new" is more stimulating sexually than something "known," explains why defendant had such an extensive collection of pornography.

Fischer testified concerning two types of child molesters. According to Fischer, "fixated" child molesters prefer the company of children and have no history of sexual relations with adults, whereas "regressed" child molesters do not restrict their sexual activities to children and might enjoy adult pornography. Fischer stated that regressed child molesters develop psychosexually into maturity, but develop a relationship with a child and then molest the child. Fischer testified that stress arising from inadequate gratification in relationships with adults, rather than professional frustration, is a factor that may prompt a regressed pedophile to molest a child. Fischer stated that to the best of his knowledge, defendant was not a regressed child molester, but Fischer acknowledged nonetheless that this was a possibility.

Defendant's other psychological expert, Dr. Thomas, also addressed the issue of defendant's pornography. Thomas described the videotape of excerpts from defendant's video collection as "pretty tame compared to the kinds of pornography I have seen," and stated that a pedophile would not be interested in the videos. With respect to the presence of models who had young faces and fully developed secondary sexual characteristics, Thomas testified that it is typical for heterosexual males to be attracted to nubile females, and that Shaved Pussy and Oriental Delight magazines were responsive to the fantasy of having sex with an adolescent female. A pedophile, Thomas testified, would be disgusted by these types of magazines, because the women depicted have secondary sexual characteristics and the articles concern adult thoughts and desires. Thomas described Bridled magazine as involving domination and sadomasochism, and testified that she would not conclude that a person who possessed one magazine like Bridled in a substantial collection of pornography was sadomasochistic. She also testified that the circumstance that a man looks at sexual images does not signify that he engages in the conduct portrayed.

---

[14] The copyright dates of Bridled, Oriental Delight, and Shaved Pussy magazines are December 1985, January 1986, and November 1988, respectively.

According to Thomas, most adults who were molested as children do not molest children, but between 40 and 50 percent of child molesters have a history of being molested. She also testified that a boy who was molested by a male and who molests as an adult generally will molest a male victim. Thomas testified it would be unusual for "a person who functioned within the normal range of sexual behavior over a 20-year period" to engage in deviant sexual behavior.

Thomas testified that a regressed pedophile has some sexual interest in children, does not act on that interest, typically gets married, has children, and may possess adult pornography. During a period of extreme stress or depression, a regressed pedophile may engage in a sexual relationship with a child for a period of time. The stress may be from internal depression or anxiety or from external events such as marital problems, loss of employment, or financial problems. Among the psychological characteristics of regressed pedophiles identified by Thomas were that the pedophile initially engages in molestation as an impulsive rather than a premeditated act, and primarily victimizes females. According to Thomas, a pedophile develops a relationship with a child in order to be loved by the child and to satisfy the pedophile's sexual needs, and does not want to cause the child physical harm.

Thomas testified it is extremely rare for a child molester to kill a child, but agreed with the statement, "Almost any child molester is capable of violence or even murder to avoid identification." She also agreed with the description of a regressed child molester contained in an article by the Behavioral Science Unit of the FBI, entitled "Child Molesters: A Behavioral Analysis"—a person who "usually has low self-esteem and poor coping skills. He turns to children as a sexual substitute for the preferred peer sex partner. Precipitating stress may play a bigger role in his molesting behavior. His main victim criterion seems to be availability . . . ." Thomas concurred that this type of molester typically coerces the child into having sex, and may or may not collect child or adult pornography.

B. *Penalty phase evidence*

1. *The prosecution case in aggravation*

The prosecution relied upon the evidence presented during the guilt phase of the trial, as well as additional testimony from Tahisha's mother, Marianne, about the impact of Tahisha's death upon the family. Marianne described the joy Tahisha brought to her large extended family in the United States and Germany. Tahisha and her brother Stefan, who was three and one-half years older than Tahisha, were very close. Tahisha was the more outgoing of the two children, and she would make friends for both of them when the family

moved. Stefan blamed himself for Tahisha's death (his mother always had told Stefan to take care of his little sister), and Marianne blamed herself both for Tahisha's death and for the guilt felt by Stefan. Stefan changed from being a happy child and good student to a poor student with behavior problems. He ran away from home, attempted to burn down the house, and asserted that he was worthless.

Marianne testified that she became depressed after losing Tahisha and had difficulty functioning, and that her depression returns at Christmas, Tahisha's birthday, and the date on which Tahisha disappeared. She has difficulty responding when persons ask how many children she has. She cannot look at videos of Tahisha. She had Tahisha's body cremated so she could keep Tahisha with her, and her anger at defendant returns when the family moves, because all she has of Tahisha is a box of ashes. Marianne testified that neither Tahisha's father and nor Tahisha's stepfather can speak about Tahisha's death.

Marianne described Tahisha as a bright child who liked to play "dress-up." Marianne had dreams of Tahisha going to college, having a career, getting married, and having children. Marianne told the jury about Tahisha's favorite books and her school projects. She shared family pictures and a booklet that Tahisha's kindergarten class had given Marianne of their feelings and how they missed Tahisha. She described learning that Tahisha's body had been found, and telling Stefan that his sister was gone.

### 2. *The defense case in mitigation*

Defendant relied upon evidence presented by the defense during the guilt phase, and also called as a witness Dr. Richard Hall, the Department of Corrections psychologist who had evaluated defendant. Hall testified that his tests indicated defendant has an IQ of 83, but defendant's history suggested he functions at a higher level. Defendant suffers from chronic depression and a generalized anxiety disorder, and has some schizoid traits that make him a loner with some compulsive behavior. Hall also testified that defendant has a strong ability to manage his emotions, would adapt well to prison, and would not be difficult for prison authorities to control.

On cross-examination, Hall concluded defendant does not have brain damage, is not schizophrenic, apparently does not hallucinate, does not have impairment of memory or of the ability to concentrate, understands the difference between right and wrong, knows how to control his own conduct, and has little empathy for others. Hall also described the amenities available in prison, such as television, a game room, movies, books, visitors, medical care, a varied menu at meals, a variety of job opportunities, and educational opportunities.

In response, defendant elicited testimony from Hall agreeing that educational and vocational opportunities do not benefit a person who has been sentenced to life in prison without the possibility of parole. Hall also acknowledged that many individuals in prison are violent and that the prison culture views certain crimes, such as child abuse, as very distasteful. He agreed that life in prison is a very harsh punishment.

Defendant's brother, Kevin, who is 13 years younger than defendant, testified that defendant was protective of him when Kevin was a child. He also testified that defendant was infrequently present during Kevin's childhood because defendant was in the military and could not afford to come home, but the brothers frequently saw each other as adults. Kevin stated that he was certain defendant did not commit the crime, and asked the jury to spare defendant's life because he is an innocent man. Kevin also stated that he loves his brother. Defendant's sister, Deborah Page-Andrews asked that the jury spare defendant's life, stating that defendant always had been soft spoken and never had raised a hand to anyone despite being abused as a child. Defendant was very good with his own children, Deborah's children, and his younger brother. She knew in her heart he could not have committed the present crime. Defendant's wife, Kwang Page, stated that defendant is a good person, that such an act is inconsistent with his personality, and that she had no idea how and why the jurors had convicted him. Kwang was very sorry for what had happened, and asked the jury not to sentence her husband to death.

## II.  DISCUSSION

### A.  *Claims related to the guilt phase*

#### 1.  *Exclusion of asserted exculpatory evidence*

##### a.  *Excluded evidence*

###### i.  *Reported sighting of Tahisha on the night of her disappearance*

Defendant moved in limine to admit a police report prepared on April 24, 1993, by Detective Andrew Espinoza of the Barstow Police Department stating: "Sergeant Gibson informed me that he had made contact with a witness who was sure that she, the witness, had seen the victim at the AM/PM Mini Mart on Montara Road last night around 10:30 p.m. [¶] Sergeant Gibson informed me that he had shown a photograph of the victim to the witness and that the witness identified the girl in the photograph as the same girl she had seen at the AM/PM Mini Mart." Defendant also sought to

introduce a second police report prepared by Detective Griego stating that Sergeant Gibson had briefed other officers on April 24, 1993, regarding "his contact with a witness who had reported seeing Tahisha at the Montara Arco AM/PM market on Friday night."

The hearing on defendant's offer of proof to admit the evidence took place almost two years after Tahisha's disappearance. Sergeant Gibson testified he did not recall the events described in the reports, and it was possible the information concerning a witness had been given to him by a third party. He testified that if he personally had shown the photograph to a witness who identified Tahisha, his practice would have been to write down that witness's name, but no name was recorded in this instance. Gibson acknowledged that the two reports, neither of which was written by him, indicated there was a witness. Gibson stated he had attempted to determine whether any such witness existed, but was unsuccessful in identifying the witness.

Detective Espinoza recalled that Sergeant Gibson told him about the witness's identification of Tahisha, but stated that Gibson had not given him a name. He testified that Gibson had sent him to the minimart on Saturday, April 24, 1993, to determine whether anyone there had seen Tahisha in the store the previous night. According to Espinoza, he spoke to the manager and clerk who were working that Saturday, as well as the night manager and everyone else whom Espinoza was able to determine had worked at the mini-mart on the evening of April 23, and no one recalled having seen Tahisha. The store manager provided Espinoza with videotapes from the store's security cameras, which recorded views of the interior of the store and the sidewalk area outside the store directly in front of the door; a person could not enter or leave the store without being recorded by a camera. When Espinoza reviewed the tapes recorded on April 23, he did not observe Tahisha (or any person resembling her) in any of the recordings. Espinoza stated he had no idea who the witness might have been.

Defendant claimed he should be permitted to present, at trial, evidence concerning the police officers' investigation to establish the possibility that Tahisha was alive at 10:30 on the evening of April 23. The trial court ruled that Sergeant Gibson could testify regarding what he had done, but not what the asserted witness had said, because her statement was hearsay and was not admissible under any exception.

ii.  *Other potential suspects*

Defendant sought to introduce evidence concerning a Phil P., 40 to 45 years of age, who resided at the Rimrock Apartments. Steve Pizzo, who lived in the Rimrock Apartments with his wife Mabel and daughter Carrie,

assertedly was prepared to testify that the day after Tahisha disappeared, Mr. Pizzo told the police that two weeks earlier, Phil P. had asked Carrie, who then was 11 years of age, to accompany Phil to the desert. According to defense investigator Ron Hawkins, Carrie would testify concerning Phil's invitation and her mother's refusal to allow her to go with Phil. Carrie would further testify that Phil rarely was in the company of the adult residents, and instead spent his time with the children, including Tahisha, in the playground area of the apartment complex. Phil sometimes attempted to teach the children to play tennis, and when he taught a child how to swing a tennis racket, he would put his arms around the child from behind the child. Carrie provided this information to the police the day after Tahisha disappeared.

Defendant also sought to introduce evidence establishing that two days after Tahisha disappeared, Brian Z. was arrested by a patrol officer for exposing himself and masturbating near the Rimrock Apartments. Detective Franey contacted Detective Griego at approximately 3:30 p.m. on Sunday, April 25, concerning the arrest, and asked Griego to proceed to an automobile towing company and check the tire pattern on Brian's vehicle. At approximately 5:15 p.m., Franey and Griego interviewed Brian and checked the pattern on the soles of his shoes.

The trial court excluded the proffered evidence, because it did not link either of these men to the crime and hence was incapable of raising a reasonable doubt as to defendant's guilt. (*People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*).) The court added that, assuming the evidence regarding Phil and Brian was of some marginal relevance, pursuant to Evidence Code section 352 the probative value of the evidence was outweighed by its undue prejudice.

b. *Discussion*

Defendant contends this evidence was admissible to prove that the police immediately focused upon him without considering other possible suspects, and "planted" evidence to implicate him. Although he now disavows the third party culpability theory upon which he relied in the trial court, he adds that, "assuming arguendo that the evidence that the police failed to investigate other suspects was somehow third-party culpability evidence under *People v. Hall*, [*supra*, 41 Cal.3d 826, 833,] it was admissible nonetheless." He asserts the exclusion of this evidence violated his due process right to present a defense, and his Fifth, Eighth, and Fourteenth Amendment rights to a fair and reliable trial. These contentions are without merit.

With respect to the reported sighting of Tahisha on the night of her murder, defendant claims evidence indicating that the police failed to record a

witness's name would have helped prove that the police "zeroed in on" defendant and "were going to make him fit" their predetermined view of the crime. In addition, defendant asserts that because the witness's statement assertedly was relevant to prove the character of the police investigation rather than to prove the truth of the matter stated, it was not hearsay evidence. Moreover, defendant claims that even if the evidence was hearsay, it came within the exception of *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 93 S.Ct. 1038], because it was reliable and was relevant to the "central issue" of his defense. Similarly, with respect to the absence of further police investigation of Phil P. and Brian Z., defendant asserts that the "failure to investigate supported the defense theory that [defendant] was targeted by a biased and fraudulent investigation." Therefore, defendant contends, exclusion of this evidence violated his federal due process right to present a defense. (*Washington v. Texas* (1967) 388 U.S. 14, 18–19 [18 L.Ed.2d 1019, 87 S.Ct. 1920].)

The flaw in defendant's theory is that the proffered evidence has no tendency to establish any relevant fact. The minimart evidence reflects that there may have been a witness who claimed to have seen Tahisha at 10:30 p.m., the police did not record the name of the purported witness, and the police thereafter attempted but failed to verify the purported sighting of Tahisha. The evidence concerning Phil P. and Brian Z. reflects that the police focused more attention upon defendant than upon other men whose conduct was brought to their attention, but that circumstance does not suggest anything other than that defendant, for valid and objective reasons, quickly became the prime suspect and that the police may have elected not to investigate other potential suspects more thoroughly.[15] The proffered evidence does not support the conclusion that the police acted maliciously or "planted" evidence against defendant. The possibility the police may have chosen not to follow up more thoroughly on all leads does not impeach the evidence against defendant. Because the proffered evidence has no tendency to establish any relevant fact, it properly was excluded by the trial court.[16]

---

[15] The record reflects that the police pursued various avenues of investigation on the Friday night that Tahisha disappeared and during the following two days. In light of the information obtained those two days—that defendant's apartment faced the satellite dishes where Tahisha last was seen; defendant was aware when children were near the satellite dishes and would come outside his apartment to confront them; defendant's apartment was the sole occupied apartment at which there had been no response to the door-to-door searches; defendant provided inconsistent statements when initially questioned; defendant displayed a bad attitude when contacted by a search volunteer; and defendant attempted suicide less than 48 hours after Tahisha disappeared and in close proximity in time to the request to examine his tire treads, subsequently explaining that he could not take the pressure of the investigation—it is not surprising that defendant quickly became the prime suspect.

[16] Defendant asserts the trial court excluded the proffered evidence concerning Phil P. and Brian Z. on the ground that the DNA evidence made it "practically impossible" for anyone else

■ As noted above, defendant alternatively asserts the evidence suggesting that the police failed to investigate other suspects was admissible as third party culpability evidence under *Hall, supra,* 41 Cal.3d 826. Third party culpability evidence is admissible if it is "capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833; see also *People v. Geier* (2007) 41 Cal.4th 555, 581 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Prince* (2007) 40 Cal.4th 1179, 1242 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*); *People v. Robinson* (2005) 37 Cal.4th 592, 625 [36 Cal.Rptr.3d 760, 124 P.3d 363] (*Robinson*).)

In arguing that the trial court should have admitted the proffered evidence as third party culpability evidence, defendant ignores *Hall*'s requirement of a link, focusing instead upon *Hall*'s rejection of the heightened standard of admissibility of third party culpability evidence established by *People v. Arline* (1970) 13 Cal.App.3d 200, 204 [91 Cal.Rptr. 520] ("There must be . . .

---

to have committed the crime. Defendant contends that the trial court's reasoning thereby "entirely begged the question raised by the defense theory of the case. If that blood evidence was planted on [defendant's] clothes by the police, as the defense argued, it certainly could not be considered unimpeachable proof of his guilt; quite the contrary, it would be compelling evidence that he was framed."

The trial court's reference to the DNA evidence related to defendant's argument that the proffered evidence should be admitted to show third party culpability, not to his theory that the evidence was proof of a malicious and fraudulent police investigation. In that context, the trial court cited *People v. Johnson* (1988) 200 Cal.App.3d 1553 [247 Cal.Rptr. 767] (*Johnson*), in which the evidence that a third party might have committed a burglary was rebutted by evidence establishing that the third party's fingerprints did not match the fingerprints at the crime scene and the defendant's fingerprints did match those at the scene. Therefore, in *Johnson,* "the totality of the evidence did not rise to the level necessary to create a reasonable doubt about [the defendant's guilt]." (*Id.* at p. 1564.) The trial judge expressed the view that *Johnson* was similar to the present case, because the DNA evidence in the present case is strong and uncontroverted.

To the extent *Johnson, supra,* 200 Cal.App.3d 1553, relied upon the strength of the prosecution's evidence against the defendant to exclude third party culpability evidence, its reasoning is suspect in light of *Holmes v. South Carolina* (2006) 547 U.S. 319 [164 L.Ed.2d 503, 126 S.Ct. 1727], which found a federal constitutional violation resulting from a rule of evidence that precluded the defendant from introducing third party culpability evidence when there is strong evidence of the defendant's guilt. The trial court's observation that this case is similar to *Johnson* does not compromise the court's conclusion that the proffered evidence was inadmissible as third party culpability evidence, because it did not link any third person to the actual perpetration of the crime. (See *Holmes v. South Carolina, supra,* 547 U.S. at p. 327 [noting "widely accepted" rule that third party culpability evidence that does not sufficiently connect the third party to the crime may be excluded].)

substantial proof of a probability" that some other person committed the offense). *Hall* rejected *Arline* "to the extent that it creates a distinct and elevated standard for admitting this kind of exculpatory evidence. . . . [C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall, supra,* 41 Cal.3d at p. 834, fn. omitted.) From this discussion, defendant concludes that third party culpability evidence may be excluded only "if it is excessively prejudicial," and he further asserts that "the trial court's discretion to exclude evidence under [Evidence Code] section 352 'must yield to a defendant's due process right to a fair trial and to present all relevant evidence of a significant probative value to his defense.' (*People v. Cunningham* [(2001)] 25 Cal.4th [926,] 998–999 [108 Cal.Rptr.2d 291, 25 P.3d 519].)" Neither the rejection of *Arline*'s heightened standard of admissibility in *Hall*, nor the presentation of significant probative evidence as a matter of right, is inconsistent with the rule discussed in *Hall* that third party culpability evidence is admissible only if it links a third party to the crime.

### 2. *Admission of certain pornographic magazines*

Defendant contends the trial court erred in admitting Shaved Pussy, Oriental Delight, and Bridled magazines. He urges that the magazines were insufficiently relevant to the issue of his intent to commit a lewd act upon a child, and that whatever probative value the magazines had was outweighed by their prejudicial effect. (Evid. Code, § 352.) He claims that the admission of the magazines in evidence violated his federal and state rights to a fair trial and to due process of law, as well as the constitutional requirement of reliability in a capital case. (U.S. Const., Fifth, Sixth, Eighth, and Fourteenth Amends.; Cal. Const., art. I, §§ 7, 15.)

In considering the relevance of the proffered evidence, the trial court stated that it perceived an "absolutely stunning similarity" between the model depicted on the cover of Oriental Delight magazine and a photograph of Tahisha, and concluded that defendant's possession of this magazine was relevant to show an interest in his particular victim. The court described the models in Shaved Pussy and Oriental Delight magazines as staged to appear younger than their actual ages, characterized the magazines as "pseudochild pornography," and concluded the magazines were relevant to demonstrate that defendant had an interest in young girls. Finally, the court found that Bridled magazine was "relevant to show an interest in bondage, infliction of pain, violence and suffering." Therefore, the court ruled, the three pornographic magazines were "relevant to show motive, intent and identity." Finally, the court concluded that the probative value of the three magazines outweighed their prejudicial effect under Evidence Code section 352.

■ In general, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Such evidence is admissible, however, "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (*Id.*, subd. (b).)

In certain circumstances, evidence of sexual images possessed by a defendant has been held admissible to prove his or her intent. In *People v. Memro* (1995) 11 Cal.4th 786 [47 Cal.Rptr.2d 219, 905 P.2d 1305] (*Memro*), the defendant was charged with first degree felony murder based upon a violation of section 288, which prohibits the commission of a lewd and lascivious act upon a child who is under the age of 14 years. The defendant in *Memro* enjoyed taking photographs of young boys in the nude, and he had escorted his victim, seven years of age, to the defendant's apartment with the intent of taking photographs of the victim in the nude. When the victim said he wanted to leave, the defendant strangled him and attempted to sodomize his dead body. The trial court admitted magazines and photographs possessed by the defendant containing sexually explicit stories, photographs, and drawings of males ranging in age from prepubescent to young adult. We concluded the trial court did not abuse its discretion, because "the photographs, presented in the context of defendant's possession of them, yielded evidence from which the jury could infer that he had a sexual attraction to young boys and intended to act on that attraction. (See *People v. Bales* (1961) 189 Cal.App.2d 694, 701 [11 Cal.Rptr. 639] [photograph of molestation victim in the nude admissible to show 'lewd intent'].) The photographs of young boys were admissible as probative of defendant's intent to do a lewd or lascivious act with [the victim]." (*Memro, supra,* at p. 865; see also *People v. Clark* (1992) 3 Cal.4th 41, 129 [10 Cal.Rptr.2d 554, 833 P.2d 561] [the defendant decapitated a victim and solicited oral copulation from other victims; picture from a pornographic book depicting a decapitated head orally copulating a severed penis "was probative of defendant's interest in that matter"].)

The magazines admitted in this case may have been probative with respect to defendant's commission of the crimes, but they had less probative value than the images considered in prior cases. None of the models whose photographs were staged to make them look younger than their age appeared to be as young as the victim, and defendant did not involve children in the production of pornographic images as did the defendant in *Memro, supra,* 11 Cal.4th 786. Although the assault upon Tahisha was violent, the acts committed against her and the acts portrayed in Bridled magazine were not similar;

in particular, there was no evidence Tahisha was bound. Finally, the photograph admitted in *People v. Bales, supra,* 189 Cal.App.2d 694, was of the victim herself, and the defendant had ordered his wife to destroy the photograph. Here, the cover of Oriental Delight featured a model who merely looked similar to Tahisha; defendant apparently took no steps to conceal or destroy the image, and the model was only one of perhaps hundreds of models who appeared in defendant's extensive pornography collection.[17]

We need not decide whether the trial court abused its discretion under Evidence Code section 352, because defendant fails to establish that the admission of the magazines was prejudicial error. In support of his contention that the admission of this evidence violated his federal and state rights to a fair trial and to due process of law, and the constitutional requirement of a reliable penalty determination in a capital case, defendant recites various principles relevant to the procedures involved in the imposition of capital punishment,[18] but he fails to cite any authority supporting the conclusion that

---

[17] As indicated, in order to establish that the three magazines introduced by the prosecution were not representative of defendant's sexual interests, the defense acquiesced in the prosecution's introduction into evidence of defendant's entire collection of pornographic magazines, and also sought and was permitted to present a videotape of 30-second excerpts from each of defendant's pornographic movies, as well as expert testimony concerning the inferences that reasonably could be drawn from the collection. While the propriety or impropriety of admitting evidence of a defendant's pornography will vary from case to case depending upon the facts, we note that such evidence may threaten to distract jurors from potentially more probative evidence and to consume undue amounts of time, a risk that has multiplied since the time of Tahisha's murder in 1993 due to the availability of pornography on the Internet and the ease with which a defendant may view thousands of pornographic images on a computer. Therefore, we urge trial courts to exercise caution in weighing the probative value of individual examples of pornography possessed or accessed by a defendant.

[18] In support of these contentions, defendant cites various cases addressing the criteria that guide the jurors' decision at the penalty phase (*Espinosa v. Florida* (1992) 505 U.S. 1079, 1081–1082 [120 L.Ed.2d 854, 112 S.Ct. 2926] [neither jury nor judge may consider invalid aggravating circumstance; aggravating factor that murder was especially wicked, evil, atrocious, or cruel was unconstitutionally vague]; *Clemons v. Mississippi* (1990) 494 U.S. 738, 752 [108 L.Ed.2d 725, 110 S.Ct. 1441] [an automatic rule of affirmance whenever there is at least one valid aggravating circumstance would be invalid]; *Maynard v. Cartwright* (1988) 486 U.S. 356, 361, 363–364 [100 L.Ed.2d 372, 108 S.Ct. 1853] [" 'especially heinous, atrocious, or cruel' " aggravating circumstance was unconstitutionally vague]; and *McCleskey v. Kemp* (1987) 481 U.S. 279, 305 [95 L.Ed.2d 262, 107 S.Ct. 1756] ["State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold" for imposition of the death penalty]).

Defendant also cites cases acknowledging the greater degree of reliability required in capital cases and the importance of ensuring a moral decision based upon relevant evidence. (*Saffle v. Parks* (1990) 494 U.S. 484, 492–493 [108 L.Ed.2d 415, 110 S.Ct. 1257] [law requires a moral response rather than an emotional response to the evidence concerning imposition of the death penalty]; *Murray v. Giarratano* (1989) 492 U.S. 1, 8–9 [106 L.Ed.2d 1, 109 S.Ct. 2765] [although "[t]he finality of the death penalty requires 'a greater degree of reliability,' " neither the Eighth Amendment nor the due process clause requires states to appoint counsel for indigent death row inmates seeking state postconviction relief]; *South Carolina v. Gathers*

the erroneous admission of the three magazines violated his federal constitutional rights at the guilt phase of the trial. In the absence of a violation of federal rights, we evaluate whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*).)

We begin by considering the evidence that supports the verdict. The evidence was undisputed that Tahisha was last seen chasing a ball that rolled down a hill to the satellite dishes immediately outside defendant's apartment. The evidence also established that defendant was home at the time, and that he generally was aware of children who ventured into the area outside his apartment. Although defendant repeatedly asserted he did not leave the apartment complex on the evening Tahisha disappeared, other evidence strongly established that he visited Coco's Restaurant in downtown Barstow that evening around 9:30, and that Coco's is located on the route that defendant took to work—a route that led to Fort Irwin Road, where Tahisha's body was dumped in a mine excavation. Undisputed evidence was presented that the outer vaginal swab from Tahisha's body contained saliva that was consistent with defendant's genetic markers, and only one in 400,000 individuals has the genetic markers that were foreign to Tahisha. The evidence also established that the blood on the shirt worn by defendant on the evening Tahisha disappeared was foreign to defendant and consistent with Tahisha's genetic markers. If the gamma and kappa markers in the blood are ignored, as defendant's expert recommended, the other seven genetic markers in the bloodstain that were foreign to defendant are found in only one in every 552,000 individuals. If the frequency of the gamma and kappa markers also is considered, the figure is one in 400 million. Inside defendant's apartment, the police recovered a stick-on earring that matched the "Friday" star earrings Tahisha donned shortly before she disappeared. Finally, a pair of pants and a

(1989) 490 U.S. 805, 811 [104 L.Ed.2d 876, 109 S.Ct. 2207] [information concerning the victim that was unrelated to the crime should have been excluded], overruled in *Payne v. Tennessee* (1991) 501 U.S. 808, 830 [115 L.Ed.2d 720, 111 S.Ct. 2597]; *Johnson v. Mississippi* (1988) 486 U.S. 578, 584 [100 L.Ed.2d 575, 108 S.Ct. 1981] ["fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special ' "need for reliability in the determination that death is the appropriate punishment" ' "; death sentence based in part upon a reversed conviction cannot be allowed to stand under the Eighth Amendment]; *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227] [jury was improperly instructed to impose a 40-year sentence rather than a sentence of at least 10 years, an error that constituted a constitutional violation]; *Gregg v. Georgia* (1976) 428 U.S. 153, 203–204 [49 L.Ed.2d 859, 96 S.Ct. 2909] ["[s]o long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions" on their presentation]; *Perry v. Rushen* (9th Cir. 1983) 713 F.2d 1447, 1450 [Sixth Amendment prevents the state from arbitrarily excluding evidence].)

pair of boots in defendant's apartment, and a floormat from one of defendant's cars, had white bentonite on them that was consistent with the bentonite in the mine pit where Tahisha's body was dumped. No other bentonite mine site within a 50-mile radius of the site where Tahisha's body was found contained white bentonite. In addition to this physical evidence, the jury heard testimony that defendant was hostile when a search volunteer contacted him concerning the missing child and that he was unusually edgy when he appeared at Coco's Restaurant the evening that Tahisha disappeared. The jury also learned that defendant had attempted suicide one day after Tahisha's body was found, and that he had informed medical personnel that the additional stress placed upon him relating to Tahisha's disappearance contributed to his suicide attempt.

Defendant's DNA expert, Marc Taylor, found no flaws in the testing of the blood sample or the saliva sample. He criticized Jones's "overloading" of DNA that occurred during the testing for the presence of foreign DNA in the rectal and internal vaginal swabs, but agreed that the test results for these two swabs did not establish the presence of foreign DNA. The same defense expert agreed that the star earring found in defendant's apartment could have come from Tahisha's package of earrings. Defendant's geology expert, Joan Fryxell, testified that the amount of bentonite collected from defendant's belongings was too minute to predict the proportions of different crystals in the clay, but she agreed that the bentonite was similar to the bentonite from the mine pit where Tahisha's body was dumped. Although Fryxell also testified that the bentonite on defendant's belongings was similar to bentonite in areas other than the site where Tahisha's body was found, she further concluded that the bentonite on defendant's work boots (which he kept at his workplace) did not match the bentonite on his pants and dress boots (which were recovered from his residence) or the bentonite from the mine pit (which was located miles from defendant's worksite). Fryxell also disclosed that she had been informed that defendant did not have an explanation concerning the source of the bentonite on his dress boots.

In the face of overwhelming evidence that defendant molested and killed Tahisha, defendant asserted there was insufficient time in which he could have disposed of Tahisha's body. He also asserted he must have been framed by the police or by the apartment complex's maintenance person, Mr. Jannsen. Defendant also argued that the police focused upon him and failed to pursue other leads, such as the pubic hair found on Tahisha's dress which, he suggested, strongly indicated that someone else committed the crimes. He also emphasized the absence of tire tracks matching his vehicles. Finally, he presented evidence that he was a "nice guy" who would not commit such crimes.

With respect to the timeline of events, it is clear Tahisha disappeared no later than 7:30 p.m. on April 23. She was alive (but perhaps not conscious) for longer than an hour but less than four hours after her vaginal injuries were inflicted. No evidence, other than defendant's statements to the police that he was home all evening, establishes his whereabouts between 7:30 p.m. and 9:15 p.m. or 9:30 p.m., when he was seen leaving the apartment complex. His presence at Coco's Restaurant between 9:30 p.m. and 9:50 p.m., and his return to the apartment complex in time for Beverly Walker to reach him by telephone sometime before 11:00 or 11:30 p.m. clearly were not inconsistent with his having driven to Fort Irwin Road during this outing and having dumped Tahisha's body at the mine site, which was a nine- to 11-minute drive from his apartment.

Defendant relied upon several circumstances in arguing that the evidence must have been planted. He presented evidence indicating that he habitually cleaned his apartment and laundered his clothes on Saturdays. Moreover, he was seen in the apartment complex's laundry room on Saturday, April 24, and a photograph of his living room taken when his apartment was searched on Wednesday, April 28, reflected marks on the carpet from vacuuming. This evidence does not tend to prove that the blood and bentonite were deposited upon defendant's clothing by others or that the earring was placed in the carpet sometime after defendant's Saturday cleaning, because (1) the laundry basket carried by defendant from the laundry room on Saturday contained bedding, and there is no evidence that he also laundered clothing, (2) the shirt worn by defendant when he returned from the laundry room was similar to the shirt he was wearing the previous night, (3) the police were unaware until May 3 that Tahisha was wearing stick-on earrings when she disappeared, (4) there was no evidence suggesting that Mr. Jannsen knew Tahisha was wearing stick-on earrings, and (5) the earring was not visible in the carpet and was recovered through a vacuuming procedure that was more thorough than the typical manner of vacuuming a carpet.[19] Moreover, defendant's theories do not explain the discovery of the saliva on Tahisha's body before any blood sample had been taken from defendant. The circumstance that DNA testing could not determine whether the GYPA marker in the saliva was from a type B or a type AB foreign donor did not constitute evidence that the saliva came from someone other than defendant.

The unidentified pubic hair was a mystery that in no way negated the strong evidence presented by the prosecution. In addition, the pubic hair was

---

[19] The Pizzos' testimony that they did not see Tahisha wearing earrings on April 23 was inconsequential in the face of the testimony of family members and a neighbor that she was wearing star earrings. Defense witness Marc Taylor's speculation that a stick-on earring might stick to a pant leg or the side of a shoe presented the unlikely scenario that Tahisha's earring had fallen off her ear, attached itself to the side of defendant's clothing, and then fallen off in his apartment and become embedded in his carpet.

not detected until April 30, by which time the evidence already gathered by the police strongly implicated defendant in the crimes, thus explaining the investigators' focus upon defendant rather than upon the pubic hair. The absence of defendant's tire tracks near the crime scene merely confirmed the circumstance that despite numerous vehicles driving in the area, no other tire tracks could be identified beside the tracks from the two vehicles that most recently had driven on the pullout.

Finally, defendant's evidence suggesting that he was a nice person and was not the type of individual who would commit such crimes was of minimal consequence in light of the evidence tending to establish that he committed the crimes. The defense established only that he was nice to some people; former girlfriend Sylvia Twiford confirmed that he yelled at children; waitress Holly Robles testified that defendant made her uncomfortable and was known among the waitresses as a "pervert," and neighbor Beverly Walker testified that defendant exhibited a negative attitude in response to her efforts to help locate Tahisha. The psychological testimony of Drs. Fischer and Thomas, which apparently was intended to establish that defendant would not molest a child, described a type of pedophile—a regressed pedophile—whose characteristics were consistent with defendant's. In addition, to the extent Fischer's testimony was intended to establish that defendant was a passive person whose background provided no indication that he would molest a child, Fischer's disclosures that defendant was an unreliable source of information about his own background and that defendant had failed to reveal to him any information concerning his brother's history of molestation deprived this aspect of Fischer's testimony of persuasive effect. Fischer's conclusions also were undermined by the circumstance that Fischer had chosen to disregard tests indicating that defendant might be the type of person who would commit such crimes.

In summary, the physical evidence overwhelmingly established that defendant committed the crimes; the defense evidence was of little weight compared to the prosecution's evidence, and the evidence suggesting that some persons thought defendant was nice and would not commit such crimes failed to raise a reasonable doubt as to defendant's guilt. In this context, we consider the impact of the admission of defendant's pornographic magazines.

The prosecutor's opening argument highlighted this evidence. He commenced his argument by presenting to the jury Bridled magazine and stating that defendant "fantasized about violent sexual conduct, about the look of fear in a woman's eyes when she's being restrained against her will and being violently attacked for sexual purposes." The prosecutor also showed the jury Shaved Pussy magazine, and asserted that defendant fantasized about sexual conduct with prepubescent girls. The prosecutor argued that defendant

took his fantasy a step further when Tahisha appeared in front of his apartment. He showed the jury the photograph of Tahisha and the cover of Oriental Delight magazine and argued that when defendant got Tahisha into his apartment, his fantasies became reality and, at some point before Tahisha lost consciousness, defendant got to see the look of terror about which he had fantasized.

Thereafter, the prosecutor made minimal use of the pornography. He showed the Bridled and Shaved Pussy magazines to Manuila Cahill when she testified that defendant was a nice person. Manuila expressed surprise that defendant possessed these magazines, but she further testified that her ex-husband possessed pornography and that she was not surprised that a single man would possess such material. The prosecution also mentioned Shaved Pussy magazine in the course of questioning Mr. Junger about the pubic hair that was found on Tahisha's dress. Other than Detective Franey, who described the magazines as "hard-core" or "triple-X" pornography, no witness testified for the prosecution concerning the nature or significance of the pornography. The prosecution did not mention defendant's pornographic material in closing argument except indirectly in response to defense counsel's discussion in his closing argument of the shaved pubic hair found on Tahisha's dress.[20]

■ Defendant contends that the magazines, considered together with the prosecution's assertion that they were proof that defendant fantasized about prepubescent girls and violent sexual conduct, "provided the one thing the prosecution's case lacked: a purported motive for [defendant] to commit a crime so grossly out of character as this one." In view of the presence of saliva consistent with defendant's saliva in the outer vaginal swab and the injury to Tahisha's vagina, the absence of the additional evidence of defendant's sexual interests would have been of no consequence. In light of the overwhelming evidence that defendant committed a lewd act upon Tahisha and murdered her, there is no reasonable probability that defendant would have achieved a more favorable result but for the admission of the three pornographic magazines. (*Watson, supra*, 46 Cal.2d 818, 836.)

---

[20] Defense counsel asserted in his argument that the prosecutor would say the pubic hair just blew into the desert and happened to land on Tahisha's dress, and counsel urged that the pubic hair was very important evidence because it did not come from defendant. In his response to the defense argument, the prosecutor asserted that the defense expected the crime scene to be sterile, and argued that a young girl running around an apartment complex would collect matter, including a stray hair, on her dress. He added, "you kind of have to wonder who have we heard about that is into this shaved pubic hair fetish to begin with? Who is likely to have shaved pubic hairs lying around, I don't know where, but God knows where he's got shaved pubic hairs lying around. Mr. Page."

### 3. *Admission of "off-color" remarks made by defendant*

In response to questioning from defendant's counsel, Holly Robles, a waitress at Coco's Restaurant, stated that when speaking of defendant to others, she occasionally referred to defendant as a "pervert," and that she felt uncomfortable around him. Defense counsel asked, "That's because he made some off-color[] remarks to you and some of the other girls?" She responded, "Not to me, to other people." Defense counsel asked, "Other than some of the off-color[] remarks that you heard other people say that he had made did he ever make a statement to you?" She answered, "No."

On cross-examination, the prosecutor asked, "And you mentioned that he was basically known as a pervert there in the restaurant among the waitresses?" Robles responded, "Yeah." The prosecutor then asked, "why did you guys refer to him as a pervert? What did he do that got him that name?" She responded, "Some of the things I guess he said to the other waitresses." The prosecutor asked, "What things did you hear about?" Defendant objected that the question called for a hearsay statement. The prosecutor responded that defense counsel had inquired concerning off-color remarks made by defendant to other persons, and that the prosecutor would like to clarify the nature of those remarks. In response, defense counsel asserted that he had inquired only as to the off-color remarks made by defendant *to Robles*. After the parties had an exchange concerning the scope of the direct examination, the trial court overruled defendant's hearsay objection.

The prosecutor continued: "It was brought out earlier by . . . defense counsel that at the restaurant there he was known as a pervert and that he made off-color remarks to some of the waitresses. . . . What off-color remarks were you aware of?" In response, Robles said that waitresses were required to ask customers whether they wished to order dessert, and defendant "would sometimes I guess tell the other waitresses, 'Yeah, if you can get on the table.' 'Stand on the table.' " The prosecutor asked, "Stand on the table and he would have them for dessert, or that would be his dessert?" She responded, "Yeah." Robles remembered only that remark, and confirmed that defendant never made any such remarks to her.

Defendant contends the testimony was inadmissible under any hearsay exception, and that its admission violated his rights under the confrontation clause of the Sixth Amendment, his due process right to a fair trial under the Fifth and Fourteenth Amendments, and his right to a reliable verdict in a capital case under the Eighth Amendment and correlative provisions of the state Constitution. He claims the statements were "highly prejudicial evidence of [defendant's] 'bad character' (Evid. Code, § 1101) that portrayed him as aggressive, salacious, and disrespectful toward women. That evidence was

particularly damaging because it conflicted with one of the major themes of [defendant's] case: that he is not the 'type' to commit a crime like this, and thus could not have done so."[21]

■ The prosecutor's question called for the admission of hearsay, because the information was sought to prove the truth of the statements other waitresses made to Robles—that defendant said if the waitress would get on the table, he would have her for dessert. Respondent does not identify either a nonhearsay purpose for which the evidence was offered, or a hearsay exception for its admission. Nonetheless, the erroneous admission of hearsay evidence alone does not establish a violation of the confrontation clause of the Sixth Amendment. "[N]ot all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted." (*Crawford v. Washington* (2004) 541 U.S. 36, 51 [158 L.Ed.2d 177, 124 S.Ct. 1354].) The confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.]" (*Crawford*, at p. 51.) The discussion among waitresses concerning defendant's behavior, prior in time to the crimes and the investigation, was not "testimonial" for purposes of the confrontation clause. Nor does defendant cite authority supporting his contention that the erroneous admission of this hearsay evidence violated various other federal constitutional rights.[22] Therefore, we evaluate whether "it is

---

[21] The People assert that defendant is barred from challenging the admission of this hearsay evidence, because defendant elicited Robles's testimony that she thought defendant was a pervert based upon off-color remarks he made to others. Defendant's election to question Robles concerning her opinion of defendant was not an invitation or agreement to the admission of inadmissible hearsay evidence, however. The People also assert that because defendant made only a hearsay objection below, he is barred from challenging the admission of the evidence on the ground that this testimony was improper "bad character" evidence. As defendant observes, he does not claim error under Evidence Code section 1101, and his reference to the hearsay as "bad character" evidence relates to his argument that its admission was prejudicial.

[22] Defendant cites *Ford v. Wainwright* (1986) 477 U.S. 399, 414 [91 L.Ed.2d 335, 106 S.Ct. 2595] (holding that procedure for determining death row inmate's sanity before execution failed to afford the defendant a full and fair hearing); *Spaziano v. Florida* (1984) 468 U.S. 447, 454–457 [82 L.Ed.2d 340, 104 S.Ct. 3154] (although the failure to give a lesser-included-offense instruction in a capital case is a constitutional violation, such instruction is not required if conviction of the lesser included offense is barred by the statute of limitations); *Beck v. Alabama* (1980) 447 U.S. 625, 637–638 [65 L.Ed.2d 392, 100 S.Ct. 2382] (procedural rule barring instruction on a lesser included offense diminished the reliability of the guilt determination with respect to the capital offense and thereby diminished the reliability of the capital sentencing determination); and *Hicks v. Oklahoma, supra*, 447 U.S. 343, 346 (jury was improperly instructed to impose a 40-year sentence rather than a sentence of at least 10 years, an error that constituted a constitutional violation; "[t]he defendant in such a case has a

reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.)

Defendant claims that the error was prejudicial because the hearsay evidence "conflicted with one of the major themes of [defendant's] case: that he is not the 'type' to commit a crime like this, and thus could not have done so." Defendant already had elicited Robles's testimony that she sometimes referred to defendant as a pervert, that defendant made off-color remarks to waitresses, and that these remarks made her uncomfortable. Defendant did not object to Robles's testimony establishing that defendant was referred to as a pervert among the waitresses. Although the example of an off-color comment provided a basis for Robles's opinion that defendant was a pervert, the evidence added little to the substance of Robles's testimony. Therefore, the exclusion of this evidence would not have made a difference in assessing the evidence that was presented to support the defense theory that defendant was a nice person who would not commit such crimes. In addition, the evidence against defendant was overwhelming. Therefore, there is no reasonable probability that defendant would have achieved a more favorable result but for the erroneous admission of this evidence.

### 4. *Instruction on consciousness of guilt (CALJIC No. 2.03)*

The trial court instructed the jury with CALJIC No. 2.03, a pattern instruction providing that a defendant's willfully false or deliberately misleading statement concerning the crimes may be considered as a circumstance tending to prove consciousness of guilt but is not sufficient by itself to prove guilt.[23] Defendant contends that this instruction merely reiterates CALJIC No. 2.00, which sets forth general principles concerning what constitutes "evidence," and CALJIC No. 2.01, which presents general limitations upon the adequacy of circumstantial evidence to prove guilt. Defendant also contends that CALJIC No. 2.03 is argumentative because it singles out particular evidence and invites the jury to draw inferences favorable to the prosecution. Finally, he asserts that CALJIC No. 2.03 allows irrational inferences concerning a defendant's mental state.

---

substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion [citation], and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State").

[23] CALJIC No. 2.03 provides: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

■ We have noted that "[t]he cautionary nature of [CALJIC No. 2.03] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*).) For example, in the present case the jury learned that before it was known that a crime had been committed and that Tahisha had been taken from the apartment complex, defendant falsely claimed he had not left the apartment complex on the evening she disappeared. A jury might have concluded that defendant's prevarications concerning his presence established that he had committed the crimes. CALJIC No. 2.03 specifically addresses this risk by acknowledging the inference that may be drawn from a defendant's willfully false or misleading statement, but precluding a finding of guilt based solely upon a willfully false or misleading statement. Thus, CALJIC No. 2.03 is not merely duplicative of CALJIC No. 2.00 and CALJIC No. 2.01, which address more general principles of evidence.[24]

Defendant cites *People v. Mincey* (1992) 2 Cal.4th 408 [6 Cal.Rptr.2d 822, 827 P.2d 388] (*Mincey*) in support of his contention that CALJIC No. 2.03 is argumentative. In *Mincey*, the trial court declined to instruct the jury that particular inferences favorable to the defendant could be drawn from specified items of evidence. We agreed with the trial court's ruling, explaining that the proffered instructions would have invited the jury "to infer the existence of [the defendant's] version of the facts, rather than his theory of defense." (*Mincey*, at p. 437.) Defendant contends CALJIC No. 2.03 is structurally similar to the instruction in *Mincey*, because CALJIC No. 2.03 instructs jurors that if they find a certain fact—that the defendant made a willfully false or misleading statement—they may infer a fact favorable to the prosecution (the defendant's consciousness of guilt). We rejected this analogy in *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190], and reject it here. As is implicit in defendant's contention that CALJIC No. 2.03 simply reiterates more general instructions concerning evidence, CALJIC No. 2.03 provides guidance concerning the uses and

---

[24] Defendant asserts we have abandoned the view that CALJIC No. 2.03 protects a defendant from an inference of guilt based solely upon dishonest statements, citing *People v. Seaton* (2001) 26 Cal.4th 598, 673 [110 Cal.Rptr.2d 441, 28 P.3d 175]. In *Seaton*, the defendant initially told the police that he had been asleep at the time the burglary, robbery, and murder were committed. At trial, the defendant admitted the murder but denied the burglary and robbery charges. On appeal, the defendant contended the trial court should have instructed the jury concerning evidence of consciousness of guilt. We concluded these instructions should have been given, but that the error was harmless because "the instructions would have benefited the prosecution, not the defense . . . ." (*Id.* at p. 673.) Clearly, in light of the defendant's admission that he had murdered the victim, the defendant would have received no benefit from an instruction that the jury could not infer guilt solely from the defendant's lie that he had been asleep during the events at issue. *Seaton*'s conclusion does not reflect any modification of our view that the instruction in question benefits a defendant who has made dishonest statements concerning the crime.

limitations of circumstantial evidence. That the instruction specifically addresses evidence indicating that a defendant made false or misleading statements concerning the crimes does not alter the circumstance that the instruction addresses the law applicable to the evidence rather than any party's version of the facts. Moreover, as noted above, the instruction is favorable to the defense, because it precludes a jury from convicting a defendant based solely upon his or her dishonest statements relating to the crimes. Consistent with our prior decisions, we reject the contention that the instruction is argumentative. (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 438 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Medina* (1995) 11 Cal.4th 694, 762 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*); *People v. Kelly* (1992) 1 Cal.4th 495, 531–532 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

■ Finally, we disagree that the instruction informed the jury that it could infer from defendant's willfully false statements not only that he committed the crimes, but additionally that he harbored the mental states required for a finding of first degree murder, intent to commit a lewd act upon a child, and the related felony-murder special circumstance. As defendant acknowledges, we rejected this contention in *People v. Crandell* (1988) 46 Cal.3d 833 [251 Cal.Rptr. 227, 760 P.2d 423] (*Crandell*), in which we observed that "[a] reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*Id.* at p. 871.)

Defendant disagrees with *Crandell*'s view that a reasonable juror would understand the reference to "consciousness of guilt" to mean "consciousness of some wrongdoing," and asserts that a reasonable juror would interpret "guilt" to mean "guilty of the crimes charged." But only if the phrase "consciousness of guilt" is considered without reference to the rest of the instructions can there be any confusion concerning the word "guilt." A jury is instructed regarding the mental state that must be found to have existed *at the time* of the commission of the crimes in order to convict a defendant of each offense and special circumstance alleged. No reasonable juror would conclude that CALJIC No. 2.03's guidance concerning an inference that may be drawn from a defendant's dishonest statements made *after* the commission of a crime establishes what the defendant was thinking at the time of the commission of the crime. Therefore, it is unnecessary for a court to instruct further that dishonest statements made by the defendant after the commission

of the crime are *not* evidence of his or her state of mind at the time of the commission of the crimes. (See *Jackson, supra,* 13 Cal.4th 1164, 1224 [CALJIC No. 2.03 does not address the defendant's mental state at the time of the offense, and no instruction that consciousness of guilt is not probative of the defendant's state of mind at the time of the crime is required]; *People v. Arias* (1996) 13 Cal.4th 92, 142 [51 Cal.Rptr.2d 770, 913 P.2d 980] [CALJIC No. 2.03 does not address the defendant's mental state at the time of the offense and does not direct the drawing of impermissible inferences].)

### 5. *Cumulative error and prejudice*

We have declined to decide whether the probative value of the three pornographic magazines outweighed their risk of undue prejudice, because any error in their admission was harmless. We have concluded that the error in admitting the hearsay statements to which Holly Robles testified was harmless. Both of these items of evidence were adverse to the defense theory that defendant was a nice person who would not commit such crimes. As we have explained, this defense theory was not persuasive in light of the extensive and overwhelming evidence of defendant's guilt as well as evidence demonstrating that defendant did not conduct himself in a friendly or kindly manner. We conclude the errors, considered together, did not undermine the evidence establishing defendant's guilt, and there is no reasonable probability that defendant would have achieved a more favorable result absent these errors. (*People v. Hinton* (2006) 37 Cal.4th 839, 872 [38 Cal.Rptr.3d 149, 126 P.3d 981]; *Watson, supra,* 46 Cal.2d at p. 836.)

### B. *Claims related to the penalty phase*

### 1. *Admission of pornographic magazines*

Defendant contends that the admission in evidence of the pornographic magazines violated his federal and state rights to a fair trial and to due process of law, as well as the constitutional requirement of reliability in a capital case. (U.S. Const., Fifth, Sixth, Eighth, and Fourteenth Amends.; Cal. Const., art. I, §§ 7, 15.) He urges that we apply the "harmless beyond a reasonable doubt" standard required by *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], to the asserted violations of his federal rights. We need not decide whether any error in admitting this evidence would constitute a violation of defendant's federal rights. The standard of review of state law error established in *People v. Brown* (1988) 46 Cal.3d 432, 447 [250 Cal.Rptr. 604, 758 P.2d 1135] (*Brown*)—whether there is a " 'reasonable possibility' " that the error affected the penalty phase determination—is the same " 'in substance and effect' " as the *Chapman* standard. (*People v. Abilez* (2007) 41 Cal.4th 472, 526 [61 Cal.Rptr.3d 526, 161 P.3d 58], quoting

*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131 Cal.Rptr.2d 468, 64 P.3d 762].) Therefore, we evaluate whether there is any reasonable possibility the jury would have sentenced defendant to life imprisonment without the possibility of parole rather than death if the pornographic evidence had been excluded. If there was no reasonable possibility of a different outcome, absent this evidence, any error in admitting the evidence was harmless beyond a reasonable doubt.

At the penalty phase, neither side referred to defendant's pornography. The prosecution emphasized the brutality of the crimes against a young child, the fear and pain Tahisha must have suffered, and the impact of the crimes upon Tahisha's family. Defendant reviewed his troubled background, presented the testimony of his family members, asserted that a sentence of life imprisonment without the possibility of parole was in some ways worse than a death sentence, and urged the jury to consider any lingering doubt concerning defendant's guilt. In addition, the trial court instructed the jury: "Evidence has been presented of defendant's lifestyle or background. You cannot consider this evidence as an aggravating factor but may consider it as a mitigating factor."

Defendant identifies two ways in which, he claims, the pornographic evidence was prejudicial. First, he notes the prosecutor's arguments at the beginning of the guilt phase of the trial—that the magazines were evidence that defendant fantasized about sexual violence against prepubescent girls— and asserts that "the only use the jury could have made of [the magazines] was as 'proof' that [defendant] is a despicable monster." Second, he asserts this evidence was devastating to his lingering-doubt defense.

As explained in our analysis of the impact of the pornographic magazines at the guilt phase of the trial (see *ante*, pt. II.A.2.), the evidence of defendant's guilt was overwhelming, and no reasonable juror could have concluded that defendant was innocent of the crimes of which he was convicted. For the same reasons that the admission of this evidence was not prejudicial at the guilt phase of the trial, its admission was not prejudicial to defendant's lingering-doubt defense at the penalty phase. In addition, the brutality of the attack on such a vulnerable victim as Tahisha, only six years of age, the sexual violation of an innocent child, the struggle she apparently put up against defendant (as evidenced by various injuries to her body), the fear and pain she must have suffered, and the manner of her death— strangulation for two and one-half to three minutes—overwhelmed any mitigating evidence that defendant was a "nice guy" who did not deserve the ultimate penalty. Adding insult to the horrible injury inflicted, on the same evening defendant molested and murdered Tahisha, he blamed Tahisha's mother for her disappearance. Within hours of committing these horrible

crimes, defendant was able to interact calmly with detectives who were investigating Tahisha's disappearance, and it apparently was the fear of being discovered as the perpetrator, and not the enormity of his crimes, that led defendant to attempt to commit suicide. The chilling circumstances of Tahisha's disappearance—a young child who was supervised by family and friends running down a hill within a secure apartment complex to retrieve a ball and vanishing—and the discovery of her body, dumped like trash in a mine pit after a brutal sexual assault, further contributed to the portrait of defendant as someone without substantial redeeming attributes. Finally, Tahisha's mother's testimony concerning the impact of the crimes upon the entire family, was devastating to the defense. We find no reasonable possibility that the jury would have chosen to sentence defendant to life imprisonment without the possibility of parole rather than death, but for defendant's possession of pornographic magazines. Therefore, the admission of this evidence was harmless beyond a reasonable doubt.

### 2. Admission of off-color remarks made by defendant

Defendant contends that Holly Robles's testimony concerning specific off-color remarks made by defendant to other waitresses was prejudicial at the penalty phase of the trial, because it was harmful to defendant's lingering-doubt argument, which was based upon his theory that "someone so passive and mild-mannered as he could not have committed these crimes, no matter how strong the physical evidence of his guilt appeared." For the same reasons that admission of this hearsay evidence was harmless at the guilt phase of the trial, it was harmless to defendant's lingering-doubt argument at the penalty phase. Moreover, evidence concerning Tahisha's injuries and death, and the devastating impact upon her family, was so aggravating that exclusion of the evidence concerning defendant's statements to waitresses clearly would have made no difference in this case. We find no reasonable possibility that the jury would have chosen to sentence defendant to life imprisonment without the possibility of parole rather than death, but for the hearsay statements related by Holly Robles. Therefore, the admission of this evidence was harmless beyond a reasonable doubt.

### 3. Failure to instruct on consideration of lingering doubt as to guilt

The trial court declined to instruct the jury to consider any lingering doubt concerning defendant's guilt in deciding the appropriate penalty, but permitted the defense to argue to the jury that it should consider lingering doubt in reaching its penalty verdict. The trial court explained: "[I]t's the Court's view that the only doubt that might be present as far as the verdict [is concerned] would be some sort of an imaginary or some possible doubt, some unreasonable doubt. There's really no lingering doubt based on the evidence in this case to support the giving of this instruction."

■ As we have observed: "It is true . . . that the jury's consideration of residual doubt is proper; defendant may assert his possible innocence to the jury as a factor in mitigation under section 190.3, factors (a) and (k). [Citations.] But there is no *requirement*, under either state or federal law, that the court specifically instruct the jury to consider any residual doubt of defendant's guilt. [Citations.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 77 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) In the present case, the trial court permitted defendant to assert he was not guilty, and defense counsel informed the jury that the concept of lingering doubt came within section 190.3, factor (k). "Instructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (*id.,* factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury. ([*People v.*] *Earp* [(1999) 20 Cal.4th 826,] 904 [85 Cal.Rptr.2d 857, 978 P.2d 15].)" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 42 [45 Cal.Rptr.3d 407, 137 P.3d 229] (*Demetrulias*).)

### 4. Challenges concerning instruction relating to the jury's discretion and deliberative process (CALJIC No. 8.88)

Defendant raises various challenges to CALJIC No. 8.88, which instructs the jury concerning the process by which to weigh the aggravating and mitigating circumstances in determining whether the penalty should be death or life in prison without the possibility of parole. All of defendant's challenges have been rejected in prior cases.

### a. Asserted vagueness

Defendant contends the instruction is impermissibly vague and ambiguous because of the phrase "so substantial" in the final sentence: "To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life." Defendant notes that the Georgia Supreme Court found that the word "substantial" rendered an instruction impermissibly vague in a capital case. (*Arnold v. State* (1976) 236 Ga. 534 [224 S.E.2d 386] (*Arnold*).) Georgia's statutory scheme described an aggravating circumstance that would support the imposition of a sentence of death as follows: " 'The offense of murder . . . was committed by a person . . . who has a substantial history of serious assaultive criminal convictions.' " (*Id.,* 224 S.E.2d at p. 391.) The Georgia court concluded that "[w]hether the defendant's prior history of convictions meets this legislative criterion is highly subjective." (*Id.* at p. 392.)

■ We rejected defendant's contention in *People v. Breaux* (1991) 1 Cal.4th 281 [3 Cal.Rptr.2d 81, 821 P.2d 585] (*Breaux*), which evaluated

basically identical language in CALJIC former No. 8.84.2 (1986 rev.). We explained in *Breaux* that the instructions as a whole adequately conveyed to the jury the appropriate manner of performing its task, and that the instruction concerning the weighing of aggravating and mitigating circumstances essentially informed the jury that it may "return a death verdict only if aggravating circumstances predominate[] and death is the appropriate verdict." (*Breaux, supra*, at p. 316.) We added that the differences between the use of "substantial" in the Georgia instruction in *Arnold, supra*, 224 S.E.2d 386, and the use of "substantial" in CALJIC No. 8.84.2 in *Breaux* were "obvious." (*Breaux, supra*, at p. 316, fn. 14.) Defendant complains that our decision in *Breaux* did not specify the differences between *Arnold* and *Breaux*. Defendant's assertion that the two cases are analogous is based upon the presence of the word "substantial" in both of the challenged jury instructions, and does not take into account the context of the use of "substantial" in each case. The jurors in *Arnold* were called upon to decide, in isolation and without further guidance, whether a defendant's prior criminal record was "substantial," whereas the jurors in the present case were instructed extensively with respect to the manner of performing their task and were called upon to compare the totality of the aggravating circumstances with the totality of the mitigating circumstances. The instructions adequately explained that the jurors "could return a death verdict only if aggravating circumstances predominated and death is the appropriate verdict." (*Breaux, supra*, at p. 316.)

### b. *Instruction concerning the appropriateness of a sentence of death*

Defendant contends that CALJIC No. 8.88 fails to convey that the death penalty must be "appropriate," not merely "warranted." Again, defendant has focused upon specific terms and ignores the instructions as a whole. This instruction informs the jury that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (CALJIC No. 8.88.) "As we have explained, CALJIC 8.88 properly describes the weighing process as ' "merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances." ' (*People v. Jackson, supra*, 13 Cal.4th at p. 1244, quoting *People v. Johnson* (1992) 3 Cal.4th 1183, 1250 [14 Cal.Rptr.2d 702, 842 P.2d 1].)" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1161 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

c. *Instruction concerning the circumstances in which a sentence of death may be imposed*

Defendant contends that the instruction given pursuant to CALJIC No. 8.88 fails to convey that the jury must return a sentence of life imprisonment without the possibility of parole if it finds that death is not an appropriate punishment, and that a life sentence is mandatory if the aggravating factors do not outweigh the mitigating factors. CALJIC No. 8.88 explains that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Defendant acknowledges that we repeatedly have rejected the contention that substantially identical language in former CALJIC No. 8.84.2 (1986 rev.) failed to explain the circumstances in which a verdict of death may be returned (*People v. Rogers* (2006) 39 Cal.4th, 826, 900 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*); *People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *Medina, supra,* 11 Cal.4th 694, 781–782; *People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131] (*Duncan*)), but asks that we reconsider our holdings.

In particular, defendant challenges *Duncan*'s conclusion that substantially identical language "clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse (i.e., that if mitigating circumstances outweighed aggravating, then life without parole was the appropriate penalty)." (*Duncan, supra,* 53 Cal.3d at p. 978.) Defendant complains that the instruction does not "explicitly" state that aggravating circumstances must outweigh mitigating circumstances, but he is unpersuasive in urging that the phrase "so substantial in comparison" does not convey this requirement. Defendant also challenges *Duncan*'s conclusion that it is unnecessary to advise the jury of the converse—if mitigating circumstances outweigh aggravating, then life imprisonment without parole is the appropriate penalty. Asserting that *Duncan* cites no authority for this conclusion, he argues that the absence of the converse instruction causes CALJIC No. 8.88 to emphasize the prosecution's theory of the case. Contrary to defendant's characterization of the instruction, CALJIC 8.88 highlights the significant burden that must be satisfied before a verdict of death may be returned, and thereby conveys that life in prison without the possibility of parole is the appropriate punishment if this burden is not met.

d. *Failure to instruct that jurors could return a verdict of life in prison if the aggravating circumstances outweigh the mitigating*

Finally, defendant complains that CALJIC No. 8.88 fails to inform the jurors that they may return a verdict of life in prison without the possibility of parole even when the aggravating circumstances outweigh the mitigating circumstances, and fails to explain that neither party has the burden of persuading the jury of the appropriateness or inappropriateness of the death penalty. As we repeatedly have held, defendant was not entitled to such an instruction. (E.g., *Rogers, supra*, 39 Cal.4th at p. 893; *Medina, supra*, 11 Cal.4th at p. 782.)

5. *Asserted juror misconduct—the cartoon in the jury room*

On the third day of penalty phase deliberations, a juror told the bailiff during a break that a cartoon was circulating in the jury deliberation room and others were laughing, causing the juror some dismay. The bailiff told the juror he would search for the cartoon in the jury room. The bailiff found the cartoon and gave it to the court. The court directed the bailiff to relate these events to counsel. In addition, counsel viewed the cartoon, and the court described it for the record. The cartoon portrays two individuals in a jail cell, and its caption depicts one saying to the other, "Hey, I got off easy—it was the jury who had to deliberate for 36 months." Defense counsel moved for a mistrial, stating that humor did not belong in the jury room and that the cartoon "shows me that this jury is being contaminated by outside influences." The prosecutor responded that the cartoon had nothing to do with the case at hand.

The court stated that it could ask the jurors, either individually or collectively, which jurors had seen the cartoon and "whether or not viewing that cartoon would in any way affect their deliberations during this penalty phase of the trial," further observing: "The Court is really concerned about exerting any kind of pressure whatsoever either individually or as a group on these jurors during this particular phase of the trial. And the Court would prefer not to make an inquiry of the jury. As far as the cartoon, it's—it is humorous. The Court does not believe that it . . . represents a lack of seriousness on the part of the jurors. They are under what the Court would believe is tremendous pressure and stress. It's a very, very serious kind of decision that they're making. And this cartoon does not in any way favor one side or the other, it just brings to mind the shared sense that in the sense they're a captive group back there in the jury deliberation room trying to achieve justice. And the Court, although it's concerned about this cartoon, does not believe that the cartoon in any way affects the integrity of whatever verdict they may return.

It's the Court's preference not to inquire of the jurors." The prosecutor was agreeable, but defense counsel stood by his motion for a mistrial and stated, "I'll stand [mute] as to what procedure should be followed." The trial court denied the motion for mistrial, stating that the grounds were insufficient, and reiterating its view that the cartoon would not affect the jury's decision.

Defendant observes that an accused has a right to an impartial jury that reaches its decision based upon the evidence rather than out-of-court sources. He relies upon *Turner v. Louisiana* (1965) 379 U.S. 466, 472 [13 L.Ed.2d 424, 85 S.Ct. 546] (deputy sheriffs who were in close and continuous contact with the sequestered jury also were witnesses at the trial) and *Mincey, supra,* 2 Cal.4th 408, 467 (juror read aloud to other jurors Bible verses concerning punishment of murderers and equating resistance to governing authorities with resistance to God). In contrast to the out-of-court sources at issue in the cited cases, the out-of-court "source" in this case was unrelated to any issue to be decided. Although the cartoon was concerned with the jury process, it did not in and of itself suggest that the jurors should rush their consideration of the appropriate penalty or otherwise conduct themselves inappropriately.

As defendant observes, when juror misconduct is established, a presumption of prejudice arises that must be rebutted by the state. He relies upon *People v. Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676] (a juror claiming to have a law enforcement background asserted that the defendant's apparent lack of a criminal background might be due to the sealing of juvenile records), *People v. Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91] (a juror discussed the trial with his neighbor, a police officer who was first to arrive at the scene of the crime and who was a witness at trial), and *In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260] (a juror claimed to know the law and misstated the law to the other jurors). Unlike the situation in the cited cases, no showing of juror misconduct was made in the present case. The jurors shared a cartoon reflecting the reality that jurors sometimes spend a lengthy period of time in jury service. The cartoon did not suggest that the jurors should rush their deliberations or favor one side over the other. A juror's concern at the presence of such humor in this setting is not a "problem which, if unattended, might later require the granting of a mistrial or new trial motion . . . ." (*People v. Keenan* (1988) 46 Cal.3d 478, 532 [250 Cal.Rptr. 550, 758 P.2d 1081].) Because neither the presence of the cartoon in the jury room nor the information provided by the bailiff suggested juror misconduct had occurred, the trial court was not required to conduct further inquiry into the cartoon's possible effect on the jury.[25]

---

[25] In arguing that the failure to investigate further was prejudicial, defendant asserts that "one plausible scenario" was that some "jurors were holding out for a life sentence, and that jurors from the majority faction used the cartoon, and its explicit message that jurors caught up

### 6. *General challenges to California's death penalty scheme*

Defendant raises various constitutional challenges that have been rejected in prior cases.

Section 190.3, factor (a) directs the jury, in determining the appropriate penalty, to take into account the circumstances of the crime and any special circumstances found to be true. Defendant asserts that this statute directs that such circumstances be considered as aggravation, but the provision does not include any reference to aggravation. He also complains that factor (a) permits almost any circumstance to be considered in aggravation, but as we have observed previously, that is the nature of the fact-specific inquiry required in evaluating the appropriate penalty. As the United States Supreme Court noted in upholding factor (a) against an Eighth Amendment challenge, "our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. See, *e.g.*, *Woodson* [*v. North Carolina* (1976)] 428 U.S. [280,] 304 [49 L.Ed.2d 944, 96 S.Ct. 2978] ('[C]onsideration of . . . the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death')." (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630].) Finally, contrary to defendant's contention, California's death penalty scheme adequately narrows the class of persons eligible to receive the death penalty. (*Prince, supra*, 40 Cal.4th at p. 1298; *People v. Gray* (2005) 37 Cal.4th 168, 237 [33 Cal.Rptr.3d 451, 118 P.3d 496] (*Gray*).)

Defendant contends California's scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because it fails to impose a burden of proof at the penalty phase. "We adhere to the principle that the assessment of aggravating and mitigating circumstances required of California penalty jurors is inherently ' "normative, not factual" [citation] and, hence, not susceptible to a burden of proof quantification.' (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].)" (*Demetrulias, supra*, 39 Cal.4th at p. 40.)

We similarly reject the contentions that the death penalty statute is unconstitutional in failing to require juror unanimity or written findings with respect to the factors in aggravation. (*Prince, supra*, 40 Cal.4th at p. 1297;

---

in protracted deliberations suffer privations similar to, or worse than, incarceration, to pressure the holdouts into submitting to the majority view." He claims this theory is supported by the circumstance that the jury reached an impasse the next day.

Nothing in the information provided to the court suggested that the complaining juror was troubled by anything other than the presence of humor in the jury room, and defendant did not suggest to the trial court that the cartoon was being used for any purpose other than humor.

*Demetrulias, supra,* 39 Cal.4th at pp. 41, 43; *People v. Morrison* (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568].) In addition, "[w]e have repeatedly held that the high court's . . . decisions [in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]] do not compel a different answer. [Citations.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 707 [68 Cal.Rptr.3d 274, 171 P.3d 2]; see also *People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Lewis* (2008) 43 Cal.4th 415, 521 [75 Cal.Rptr.3d 588, 181 P.3d 947].)

We likewise reject defendant's claims that (1) the death penalty statute's inclusion in the list of mitigating factors of adjectives such as "extreme" and "substantial" improperly limits consideration of mitigation in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments (*Prince, supra,* 40 Cal.4th at p. 1298); (2) the phrase "whether or not" in section 190.3, factors (d) through (h) and (j) allows the absence of a mitigating factor to be considered as an aggravating circumstance; and (3) the failure to instruct that statutory mitigating factors may be considered solely as mitigating precludes a reliable, individualized sentencing determination as required by the Eighth and Fourteenth Amendments. (*Gray, supra,* 37 Cal.4th at p. 236.)

We repeatedly have rejected challenges made under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the absence of intercase proportionality review. (*Prince, supra,* 40 Cal.4th at p. 1298; *Demetrulias, supra,* 39 Cal.4th at p. 44; *People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749].) And, as defendant acknowledges, in *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1288 [232 Cal.Rptr. 849, 729 P.2d 115], we rejected an equal protection challenge to the death penalty scheme. Finally, we have declined to accept the view that international law compels the elimination of the death penalty in California. (*Prince, supra,* 40 Cal.4th at p. 1299; *Demetrulias, supra,* 39 Cal.4th at pp. 43–44; *Snow, supra,* 30 Cal.4th at p. 127.) We are not persuaded that we should reconsider these determinations.

### 7. *Cumulative error and prejudice*

As we have explained, any error in admitting the pornographic magazines was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt, the brutality of his attack upon Tahisha, his cold and callous manner in the hours after he committed the crimes, and the devastating impact of the crimes upon Tahisha's family. In addition, the error in admitting the off-color remarks was harmless at the penalty phase, because no lingering doubt could exist that might be eliminated by this hearsay evidence. Considering these two items of evidence together, we find there is no reasonable possibility that the jury would have chosen to set defendant's punishment at life imprisonment without the possibility of parole rather than

death, but for the admission of the three pornographic magazines and the hearsay statements. Therefore, the admission of the evidence in question was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24; *Robinson, supra*, 37 Cal.4th at p. 655; *Brown, supra*, 46 Cal.3d at p. 447.)

## III. DISPOSITION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 20, 2008, and the opinion was modified to read as printed above.